UNITED STATES

v.

**Benjamin H. WOODS, Appellant in No. 90–3044,**

**Michael A. Hartman, Appellant in No. 90–3045,**

**Ablebuilt Construction Company, Inc., a/k/a Ablebuilt Homes, Inc., Appellant in No. 90–3046.**

**Nos. 90–3044, 90–3045 and 90–3046.**

United States Court of Appeals, Third Circuit.

Argued Aug. 13, 1990.

Decided Oct. 1, 1990.

Charles F. Scarlata, Scarlata & Plastino, Pittsburgh, Pa., for appellant Benjamin H. Woods.

John L. Doherty, Manifesto, Doherty & Donahoe, Pittsburgh, Pa., Ellen M. Viakley (argued), Pittsburgh, Pa., for appellant Michael A. Hartman.

Timothy J. Wojton, Pittsburgh, Pa., for appellant Ablebuilt Const. Co., a/k/a Ablebuilt Homes, Inc.

Thomas W. Corbett, Jr., U.S. Atty., Constance M. Bowden (argued), Asst. U.S. Atty., Paul J. Brysh, Asst. U.S. Atty., Pittsburgh, Pa., for the U.S.

Before MANSMANN, GREENBERG and SEITZ, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

On June 22, 1989, appellants Benjamin Woods, Michael Hartman, and Ablebuilt Construction Co., were charged in a twenty-nine count indictment which included a RICO count under 18 U.S.C. § 1962(c), the City Council of Pittsburgh being the RICO enterprise, numerous Hobbs Act counts and tax counts, arising from public corruption in the Pittsburgh area.[1] They were all convicted on certain counts at a jury trial and have appealed from the judgments of

---

1. The twenty-nine counts contained in the indictment break down as follows. Count 1 charged Woods and Hartman with conspiring to defraud the United States in violation of 18 U.S.C. § 371, by filing false income tax returns. In Count 2 Woods was charged with conspiring with Joseph S. Wozniak, an unindicted co-conspirator, with conspiring to defraud the United States in violation of 18 U.S.C. § 371, by filing false income tax returns. Count 3 charged all three appellants with having conducted the affairs of an enterprise, the Pittsburgh City Council, through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c). Counts 4 through 10 charged Woods with extorting money, due neither to himself nor his City Council office, from Ablebuilt, through its president Hartman, in violation of the Hobbs Act, 18 U.S.C. § 1951. Counts 11 and 12 charged Woods with extortion from the partnership of Hartman and Hartman acting through Hartman in violation of the Hobbs Act, 18 U.S.C. § 1951.

The indictment charged that Hartman was a partner in Hartman and Hartman which was in the construction and property management business. Counts 13 through 15 charged Woods with extortion from Joseph Wozniak in violation of the Hobbs Act, 18 U.S.C. § 1951. Counts 16 through 20 charged Woods with evading payment of his federal income tax for the years 1983, 1984, 1985, 1986 and 1987, in violation of 26 U.S.C. § 7201. Counts 21 and 22 charged Woods with making false statements in his amended federal individual income tax returns for the calendar years 1983 and 1984, in violation of 26 U.S.C. § 7206(1). Counts 23 through 26 charged Hartman with making false statements in his individual income tax returns for the calendar years 1983, 1984, 1985 and 1986, in violation of 26 U.S.C. § 7206(1). Counts 27 through 29 charged Hartman with making false statements in Ablebuilt's federal corporate tax returns for the calendar years 1983, 1984 and 1985, in violation of 26 U.S.C. § 7206(1).

conviction and sentence.[2] While they have raised various issues we have concluded that only their constitutional challenge to their convictions on Count 3, charging a violation of RICO, 18 U.S.C. § 1962(c), warrants discussion.

## I. FACTS

Inasmuch as the jury delivered a guilty verdict we relate the evidence in a light favorable to the government. In the early 1980's, Joseph Wozniak, an unindicted co-conspirator who testified with a grant of immunity, was able to have Eco–Seal, a weatherproofing product he sold, specified for use in projects of the Pittsburgh Housing Authority. In addition, Wozniak sold another waterproofing product, Sinak, for use on public projects.[3] In return for these sales, Wozniak bought hundreds of dollars of tickets for political functions from the Director of the Housing Authority, Daniel Pietragallo, paying for them in cash.[4] It appears, however, that the ticket situation was from Wozniak's view point out of control as he was "being hit by a lot of tickets, by a lot of sources" and "was having a problem paying on some of these tickets." Consequently, Wozniak at Pietragallo's suggestion, arranged a meeting with Woods. Woods was known to Wozniak from "political functions" and "fund raisers" and Wozniak was aware that he was a member of both the Pittsburgh City Council and the Board of Directors of the Housing Authority. When Pietragallo told Wozniak to see Woods, Wozniak understood that he was being told to do business with Woods.

Woods was apparently an influencial member of the City Council as he was chairman of its Finance Committee from 1983–85 and in 1985 was elected its president, an office he held until 1987 when he was elected its President–Pro Tem. Woods also served as a member of the Board of Directors of the Housing Authority at the times material to this case.

At their first meeting, Wozniak agreed to "kick back" to Woods approximately 10% of the gross Wozniak realized from sales of Eco–Seal to contractors for Housing Authority projects. Wozniak understood that the arrangement was that as long as he made the payments to Woods, "everything would continue the way it was." On the other hand, if he did not pay up Wozniak understood that there would be "a very good chance that Eco–Seal would no longer be used" or that a competitor "could come in there with the same arrangement" and he would lose the business. Woods and Wozniak also discussed the use of Eco–Seal in projects of other government agencies and, according to Wozniak, Woods was to use his influence in "opening up doors" and would receive 10% of the gross Wozniak realized from these sales.

In early 1983, in anticipation of a particularly large sale, Woods and Wozniak reviewed how Woods was to be paid and agreed that Wozniak would pay him the 10% directly by check. Not surprisingly, however, they became uncomfortable with this arrangement because of Woods' public position. Accordingly, they agreed that Woods would thereafter be paid through checks made payable to third parties but that his percentage would be increased to 25% of gross sales. On January 4, 1983, in furtherance of this new understanding, Wozniak paid Woods $1,800 for his influence as a member of the City Council. Wozniak instructed his accountant to record the check as the payment of a commission and this transaction is racketeering act ten in the RICO count.[5] At about the

---

**2.** Woods was found guilty on Counts 1, 2, 3, 7, 9 and 11 through 22. Hartman was convicted on Counts 1, 3, and 29. Ablebuilt was found guilty on Count 3.

**3.** We note that in the indictment the product is called "Sinac." We are using the spelling "Sinak" as the parties use it in their briefs.

**4.** Some payments were made at a Pittsburgh restaurant called "The Common Pleas."

**5.** Racketeering act ten charged Woods with soliciting, accepting, and agreeing to accept money from Wozniak in consideration for his assistance, as a member of the City Council, in obtaining contracts for the use of Sinak and Eco–Seal.

same time Wozniak paid Woods a total of $20,220, through a series of six checks and a political contribution.[6] These six checks comprise six of the eight sub-parts to racketeering act nine.[7] The $20,220 represented roughly 25% of the $79,600 in gross sales Wozniak had made to a company known as Lori Waterproofing for use on a city project.

While most of the payments to Woods were in consideration for his influence in Housing Authority projects, some of the projects involved were undertaken by the Three Rivers Stadium Authority and the Allegheny County Sanitary Authority (ALCOSAN). Thus, Woods arranged a meeting between Wozniak and the Executive Director of the Three Rivers Stadium Authority following which Wozniak sold Eco-Seal for Three Rivers Stadium, a sale valued at $10,890. For this sale Wozniak paid Woods a total of $3,711, through two checks payable to B & C Equipment Rental, one dated October 19, 1983, for $1,000, and a second dated December 21, 1983, for $2,711, payments reflected in racketeering act twelve.[8]

In December 1983, Woods introduced Wozniak to James Creehan, the Executive Director of ALCOSAN, which placed an order for Eco-Seal totaling $3,902.95. At the time of the purchase Wozniak, Woods, and Creehan discussed the fact that ALCOSAN rules required advertisement for competitive bidding on contracts in excess of $4,000. On March 2, 1984, at Woods' instruction, Wozniak wrote a check payable to Burt Labovick, a party unknown to Wozniak, for $500. This transaction, charged as racketeering act eleven,[9] was a payment to Woods, although at trial Wozniak could not recall the particular contract involved. On January 25, 1984, Wozniak paid Woods $1,146 directly by check, a payment Wozniak described as the "kick back" to Woods for the ALCOSAN job.[10] This payment is set forth in the indictment as racketeering act thirteen.[11]

In August 1984, Wozniak sold $24,940.90 worth of Sinak to Tri-State Waterproofing for use in a Housing Authority project known as Bedford Dwellings. On August 31, 1984, Wozniak wrote a check payable to Rivell Industrial Contracting, Inc. for $4,400. Wozniak testified that he never had any dealings with that company and that he wrote the check at Woods' instruction to pay him for the Tri-State contract. This transaction is set forth in racketeering act nine.

Wozniak also sold Sinak for use in the construction of the Bloomfield Bridge, Anjo

6. At the trial, Wozniak identified six checks he had written and delivered to Woods, specifically including check 466, dated January 3, 1983, payable to Woods for $2,000, and checks numbered 547, 575 and 598, each for $1,500, dated respectively, March 23, April 30, and May 24, 1983, made payable to Pat McFalls Esq. Wozniak testified that while these checks were marked "legal services", he had never engaged McFalls for legal services. The other two checks Wozniak identified were payable to B & C Equipment Co.,—one numbered 641 and dated July 8, 1983, for $1,000 and the other dated July 19, 1983, for $12,570. Wozniak testified that he had no knowledge as to the existence or nature of B & C Company. Wozniak also testified that he had made a $300 contribution to a campaign of a friend of Woods, in the expectation that $150 of that contribution would then be given to Woods.

7. Racketeering act nine charged Woods with soliciting, accepting and agreeing to accept money from Wozniak in return for his assistance in insuring that Sinak and Eco-Seal would be specified in Housing Authority projects.

8. Racketeering act twelve charged Woods with soliciting, accepting and agreeing to accept both of these checks as consideration for his assistance in having Eco-Seal specified for use in the Three Rivers Stadium project.

9. Racketeering act eleven charged Woods with soliciting, accepting and agreeing to accept payment from Wozniak in return for his influence in obtaining contracts for the sale of Eco-Seal and Sinak.

10. While the indictment refers to this check as having been written on January 25, 1984, the record shows that Wozniak testified that the same check was written on "7/25, 1984." *Compare* App. at 520 *with* App. at 41. However, the parties do not address this discrepancy. We believe that January 25, 1984, is the correct date.

11. Racketeering act thirteen charged Woods with having solicited, accepted and agreed to accept, money from Wozniak as consideration for Woods' influence in obtaining a contract for the sale of Eco-Seal to ALCOSAN.

Construction being the contractor on that job. Originally the contract and plans for the bridge specified the use of linseed oil to seal the concrete but Wozniak met with Paul J. McDermott, the Director of the Pittsburgh Department of Engineering and Construction (DEC), to discuss specification of Sinak instead of linseed oil and Woods, at Wozniak's request, also spoke with McDermott about the matter.

The DEC is the agency responsible for the design and construction of Pittsburgh's capital budget projects but it must obtain authorization from the Finance Committee of City Council before it can award contracts. McDermott knew Woods to have been a member of the Finance Committee during his time as a council member, and was also aware that Woods had been the committee's chairman at sometime between 1983–85. Woods contacted McDermott several times by telephone to promote the use of Sinak on the Bloomfield Bridge project and McDermott testified that he felt that Woods was trying to use his influence to get him to specify the use of Sinak. Specifically, McDermott testified as follows:

> Q. Did you at any time, Mr. McDermott, believe that Mr. Woods was attempting to influence you to use Sinak on the Bloomfield Bridge job?
>
> A. Yes.
>
> Q. Did you at any time feel pressured in any way by Mr. Woods to use Sinak on the Bloomfield Bridge job?
>
> A. Well, I felt the attempt to influence; and if that's calculated as pressure, yes.
>
> Q. What was—in what way did you feel pressured by Mr. Woods?
>
> A. Only by the number of calls and his sense of interest in having the Sinak used.

App. at 968.

Eventually McDermott issued a change order to make Sinak the specified weatherproofing product for the Bloomfield Bridge project and Wozniak supplied it to Anjo Construction. On November 4, 1986, Wozniak sent Anjo Construction an invoice which was later paid for $43,128.36. On January 9, 1987, at Woods' instruction Wozniak wrote a check payable to Faber Rental for $4,300, even though he knew nothing of that company. This check was a payment to Woods for approximately 10% of the value of the Sinak sale on the Bloomfield Bridge. This transaction is set forth in racketeering act fourteen.[12]

During roughly the same time period that he was dealing with Wozniak, Woods entered into a similar relationship with Ablebuilt Construction Co., through its president Michael Hartman. Ablebuilt was in the business of constructing and renovating housing in Pittsburgh, including projects for the Pittsburgh Housing Authority and the Urban Redevelopment Authority.

On March 27, 1984, The Housing Authority entered into an agreement with Ablebuilt to modernize certain row houses as part of a Housing Authority project, known as Northview Heights, for $1,403,000. Louis Billota, a Pittsburgh landscaper, who like Wozniak had been granted immunity, testified that after he heard that Hartman and Ablebuilt had been awarded the Northview contract, he contacted Woods to request that Woods contact Hartman to put a "good word" in for him concerning a possible landscaping subcontract and that Woods told him that "[h]e'd take care of it." Billota made a landscaping sub-contracting bid on Northview Heights for $155,000, and was awarded the subcontract three or four days after his conversation with Woods.

After Bilotta had been awarded the contract, Hartman attempted to withdraw it, causing Bilotta to ask Woods to intervene on his behalf. Woods instructed Bilotta to meet Hartman at a local restaurant, where Hartman produced the contract which he cut to $82,000. Hartman also agreed to advance Bilotta $5,000 so that Bilotta could get back some cars which had been repossessed.

---

12. Racketeering act fourteen charged Woods with soliciting, accepting, and agreeing to accept payment from Wozniak in return for his assistance in having Sinak specified for use on the Bloomfield Bridge project.

Bilotta began work at Northview in May 1984. The job lasted for about one year and Bilotta was paid weekly. In July 1984, Hartman met Bilotta at the Northview worksite and Bilotta informed him that he was owed $1,000 for the work he had done that week. Hartman then wrote a check payable to Bilotta for $2,000, and asked Bilotta to cash it and give $1,000 to Woods and tell him that Hartman wanted an early progress payment from the Housing Authority.

Bilotta cashed the check and delivered $1,000 to Woods, telling him that Hartman wanted an early progress payment. Woods took the money and told Bilotta that he would take care of it. This payment is set forth in racketeering acts one and five.[13]

About a month later, Hartman again approached Bilotta at the Northview worksite with two checks drawn on Ablebuilt's account, both dated August 8, 1984, one for $3,000 and the other for $1,500. Hartman asked Bilotta to deliver the proceeds of the $1,500 check to Woods and to ask him for another early progress payment. Bilotta cashed the two checks, kept $3,000 for his landscaping services and delivered $1,500 to Woods, telling him that Hartman wanted another early progress payment. Woods again told him that "he'd take care of it" and that he was going "to call Danny in Florida", a reference to Housing Authority Director Dan Pietragallo. Pietragallo acknowledged at trial that Woods had contacted him about progress payments on the Northview Heights project. This transaction is set forth in racketeering acts one and five.

In August 1984, Hartman wrote a $3,000 check dated August 16, 1984, payable to Bilotta, who cashed it, giving the proceeds to Woods, a transaction set forth in racketeering acts one and five. Bilotta testified that during his work at the Northview project, he delivered six or seven pay-off checks to Woods, totaling approximately $8,000 or $9,000.

On Hartman's behalf, Woods also contacted Paul Brophy, the Executive Director of the Urban Redevelopment Authority of Pittsburgh. The Redevelopment Authority had its own board of directors but was dependent on the City Council for almost all of its money and for approval of property transactions. Specifically, on March 25, 1985, Woods contacted Brophy about Hartman's redevelopment application for a "project review" concerning a proposal for the construction of subsidized housing. As a result of this contact, Brophy sent Hartman's application to Harvey Young, Director of the Department of Housing, for an expedited review. Young responded in a memo dated March 27, 1985, in which he indicated that the Hartman proposal called for a per unit subsidy twice than that routinely granted.

On May 7, 1985, after having received Young's memo, Brophy met with Hartman to negotiate the terms of the proposal. Brophy was very concerned over the cost of Hartman's proposal as government subsidies were involved. In a subsequent telephone conversation between Woods and Brophy concerning Hartman's proposal, Woods told Brophy that he felt that the Redevelopment Authority was being unreasonable and too hard on Hartman, and that it should reformulate its position and move the deal along.

On May 9, 1985, Hartman gave Bilotta a check, payable to Bilotta, for $5,000. Bilotta was to give the proceeds to Woods with a message to " '[t]ell him I'm going to see Paul Brophy at the [Redevelopment Authority]' and for him to take it easy on him." This transaction is set forth in racketeering acts two and six.[14] Bilotta cashed

---

**13.** Racketeering act one charged Hartman and Ablebuilt with offering, conferring, and agreeing to confer a bribe upon Woods. Racketeering act five charged Woods with soliciting, accepting and agreeing to accept payment from Hartman and Ablebuilt in return for his assistance in obtaining accelerated progress payments for Ablebuilt from the Housing Authority.

**14.** Racketeering act two charged that Hartman and Ablebuilt offered, conferred and agreed to confer a pecuniary benefit upon Woods in return for his influence with the Urban Redevelopment Authority. Racketeering act six

the check and showed the money to his son, then a law student, who advised his father to protect himself by tape recording his conversations with Woods and Hartman.

That same night Bilotta called Woods and told him "I got an envelope for you from Mike" and Woods instructed Bilotta to bring it to his home. When Bilotta delivered the money to Woods he told him that:

This is from Mike. It's for Paul Brophy. He wants you to talk to Paul Brophy. He's going to be there in a couple days.

App. at 1286.

Woods took the money and said "okay".

A week later Hartman called Bilotta and told him that his meeting with Brophy "went okay but not as good as it should have." Bilotta then called Woods and told him that "he better talk to Brophy because it didn't go the way he [Hartman] wanted it to." Woods said he would take care of it. Later, after a Hartman–Brophy meeting, Hartman called Bilotta and told him that "everything went good, and that was it."

Brophy testified as follows to the effect Woods' role had upon the negotiations over Hartman's proposal:

Q. Sir, what effect, if any, did Defendant Woods' calls to you have on you?
A. Well, it—first of all, I always listened to Ben [Woods] when he called because he was basically saying move these things faster along, and I respect that. It put me in a difficult position, however, because we were trying to bargain with Mr. Hartman on this, and I found myself in a situation where I had a City Council person in that negotiation, not in a room in the negotiation, but certainly making phone calls on it.

And it certainly made it tougher for us to negotiate with Mr. Hartman because I'm always—at that point I was always in this juggling situation, you see, wanting to put as little money as possible into the deal, but not wanting the deal to go away. But the person I'm negotiating with has always got to believe that I'm prepared to let the deal go away, or there wouldn't be much of a negotiation going on.

And I think the situation I found myself in was that it was very hard for any of us to believe that the deal could go away because Mr. Woods felt so strongly that it should happen.

App. at 1577.

Harvey Young also testified as to contact that he had with Woods concerning Hartman's proposal. Young recalled that Woods had asked him if he was "taking care of his man," a reference Young understood to be to Hartman.

Bilotta delivered another $1,000 from Hartman to Woods in June 1985, with the message that Hartman's brother Gary was going to be taking an electrical licensing test for the City of Pittsburgh. When Gary Hartman failed the test, Hartman contacted Bilotta and told him to call Woods and tell him about what had happened. Bilotta did so, and Woods told him, "[w]ell, tell Mike [Hartman] not to worry about it when he goes back." A week later Bilotta heard from Hartman that his brother had passed the exam, which was apparently only given to Gary Hartman. The payment of this $1,000 is set forth in racketeering acts three and seven.[15]

In the fall of 1985, after Hartman held a fund raiser on behalf of Woods, Hartman and Woods established direct contact. Bilotta testified that thereafter Woods would no longer return his telephone calls. At this point, roughly late December 1985, to February 1986, Bilotta followed his son's suggestion from the previous May, and recorded his conversations with Woods and Hartman. At a pretrial hearing, Bilotta

charged that Woods agreed to and did accept payment from Ablebuilt and Hartman, in return for his assistance in obtaining contracts with the Redevelopment Authority.

15. Racketeering act three charges Hartman and Ablebuilt with offering, conferring and agreeing to confer payment to Woods in return for his assistance in having Hartman's brother, identified in the indictment only as "a person known to the grand jury," certified as an electrician for purposes of public projects. Racketeering act seven charges that Woods solicited, accepted, and agreed to accept the $1,000 payment for such assistance.

testified that he had no intention to use the recordings to blackmail or extort money from either Woods or Hartman but rather he made the tapes for his own protection.

On the morning of January 14, 1986, Hartman gave Bilotta two checks, one for $1,500, and a second for $2,000. Bilotta testified that he was supposed to cash these checks and keep $1,500, return $1,000 to Hartman and give $1,000 to Woods. On that same day Bilotta recorded several conversations he had with Woods and Hartman.

After he received these checks and cashed them, Bilotta returned $1,000 to Hartman. Bilotta then spoke to Woods by telephone, a call which Bilotta recorded, and complained that he was paid only $1,500 while he was supposed to receive $2,000 as an advance on work he was to do for Hartman and Ablebuilt. After his conversation with Woods, Bilotta called Hartman and told him that Woods wanted another $1,500 and that he could contact Woods directly to confirm it. About five minutes later Hartman called Bilotta and asked him to come to his house to pick up another check for $1,500, which Bilotta did. Before cashing this check, he gave $2,000 to Woods from the proceeds of the first two checks, and then kept the $1,500 check and $500 from the original two checks for a total of $2,000. This incident is set forth in racketeering acts four and eight.[16]

On February 6, 1986, Hartman gave Bilotta a check for $3,000 to cash with instructions to give $2,000 to Woods. On February 16, 1986, Bilotta received another check for $2,000 from Hartman and gave the whole $2,000 to Woods. These transactions are set forth in racketeering acts two and six.

On March 20, 1986, Hartman gave Bilotta two checks which he signed for Ablebuilt, one for $4,000 and a second for $2,000, both payable to Bilotta. Of the proceeds of the $4,000 check, $2,500 was to be returned to Hartman, and Bilotta was to retain the remaining $1,500 as payment for landscaping work. The proceeds of the $2,000 check were to be given to Woods. Bilotta cashed the checks and, in accordance with Woods' direction, gave $2,000 to Woods' son. The March 20, 1986, check for $2,000 is set forth in racketeering acts four and eight.

On June 22, 1989, the grand jury returned the indictment against Woods, Hartman, and Ablebuilt, all of whom pleaded not guilty. Woods and Hartman filed a joint motion to dismiss Count 3, alleging that RICO is unconstitutionally vague and Woods and Hartman also moved to suppress the tape recordings Bilotta had made of his telephone conversations with them. These motions were denied but the district court did dismiss Counts 24 and 25.

At the conclusion of the government's case, Hartman moved for a judgment of acquittal as to Counts 23, 26 and 27. The Government agreed to a dismissal of Counts 23 and 27, and the court granted Hartman's motion as to Count 26. Appellants then moved unsuccessfully for acquittal on Count 3, charging the RICO violation. After the close of the trial, but before the jury was charged, the court dismissed Counts 4, 5, 6, 10 (Hobbs Act violations as to Woods) and 28 (charging Hartman with making a false statement on Ablebuilt's federal corporate income tax return for 1984).

Woods was eventually found guilty on Counts 1, 2, 3, 7, 9, and 11 through 22 but he was found not guilty on Count 8. He was sentenced to eight years' imprisonment on Counts 3, 7, 9, and 11 through 15, and five years imprisonment on Counts 16 through 19. On the remaining Counts he received sentences of imprisonment of 24 months followed by three year terms of supervised release on Counts 1, 2 and 20 and a one year term of supervised release on Counts 21 and 22. Woods was to serve all of his custodial sentences concurrently.

16. Racketeering act four charged Hartman and Ablebuilt with offering, conferring and agreeing to confer payment upon Woods for his assistance in obtaining contracts with the Housing Authority of the City of Pittsburgh. Racketeering act eight charged Woods with soliciting, agreeing to accept and accepting payment from Hartman and Ablebuilt in return for his assistance in obtaining contracts with the Housing Authority.

Hartman was convicted on Counts 1, 3 and 29. On Count 1 he was sentenced to 13 months of imprisonment followed by three years of supervised release and a $30,000 fine. On Count 3, he was fined $10,000 and was sentenced to one year of imprisonment to be served consecutively to that on Count 1. On Count 29 he was sentenced to one year of imprisonment to be served concurrently with the sentence on Count 3. Ablebuilt was convicted on Count 3 and was fined $20,000.

This consolidated appeal followed.

## II. CONSTITUTIONALITY OF RICO

Appellants contest their conviction on Count 3, asserting that 18 U.S.C. § 1962(c) is unconstitutionally vague so that they were denied due process of law.[17] Specifically, they urge that the statutory provision prohibiting the conducting of an enterprise's affairs through a "pattern of racketeering activity" is so imprecise that persons of reasonable intelligence are left to guess what constitutes a "pattern of racketeering activity", thus creating the possibility of arbitrary and discriminatory enforcement.[18]

■ A statute violates due process of law if it "either forbids or requires the doing of an act in terms so vague that men of ordinary intelligence must necessarily guess as to its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See United States v. Pungitore et al.*, 910 F.2d 1084, 1104 (3d Cir.1990). However, vagueness challenges not implicating the First Amendment, " 'must be examined in the light of the facts of the case at hand.' " *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct.

316, 319, 46 L.Ed.2d 228 (1975). Therefore, outside of the First Amendment context, a party has standing to raise a vagueness challenge only if the challenged statute is vague as to that party's conduct. *New York v. Ferber*, 458 U.S. 747, 767–69, 102 S.Ct. 3348, 3360–61, 73 L.Ed.2d 1113 (1982); *Pungitore*, at 1104.

■ Appellants contend that their challenge is a facial attack on the constitutionality of RICO and not a challenge as to its application in this particular case. Accordingly, they argue that we should focus solely upon the vagueness of the statutory language itself rather than their conduct. Nevertheless, inasmuch as they have not demonstrated that as applied to them RICO implicates values protected by the First Amendment, they are confined to a challenge that the statute is unconstitutional in its application to their specific conduct. *See Pungitore*, at 1103–04.

■ This is not the first time that this court has been faced with a constitutional challenge to RICO. In *Pungitore* we rejected an identical constitutional challenge, albeit in an organized crime context. *Pungitore*, at 1102–03. Here, as did the appellants in *Pungitore*, appellants rely heavily upon Justice Scalia's concurrence in *H.J Inc. v. Northwestern Bell Telephone*, —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

In *H.J. Inc.*, while not faced with a void for vagueness challenge, the Supreme Court was called upon to consider what course of conduct would satisfy RICO's pattern of racketeering activity requirement. *Id.* 109 S.Ct. at 2897. The Court adopted an analytical approach composed of two constituent elements. The first element is one of relatedness among the predi-

---

**17.** Section 1962(c) reads as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

We are exercising plenary review over this constitutional issue.

**18.** Appellants do not argue that the statutory phrase *"conduct of such enterprise through"* is unconstitutionally vague. Rather, in appellants' brief it is argued that there was insufficient evidence to establish a nexus among themselves, the predicate racketeering acts and the enterprise to satisfy the requirement that they had conducted the enterprise *through* a pattern of racketeering activity.

cate racketeering acts which serve as the basis for a RICO prosecution. This relationship is established where the predicate acts charged

> have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.

*Id.* at 2901 (citation omitted).

The second constituent element, which requires a showing that "the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity" was the more troubling to the Court. *Id.* The Court indicated that continuity is centrally a temporal concept which can be established through a series of related predicate acts committed over a substantial period of time or by the commission of related predicate acts over a shorter period of time, where the acts by their nature demonstrate a threat of continuity. *Id.* at 2902.

In his concurrence, Justice Scalia took the majority to task for what he considered its "murky discussion" which "has added nothing to improve our prior guidance, which has created a kaleidoscope of circuit positions." *Id.* at 2908. He concluded by noting that:

> No constitutional challenge to this law has been raised in the present case, and so that issue is not before us. That the highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when that challenge is presented.

*Id.* at 2909.

This case, as did *Pungitore*, presents the constitutional challenge Justice Scalia anticipated.

As in *Pungitore*, we are constrained to consider the vagueness challenges in light of the evidence of the conduct involved. *Pungitore*, at 1104. Accordingly, our inquiry focuses upon the question of whether a person of reasonable intelligence would know that the conduct we have described constitutes a pattern of racketeering activi-

ty. Clearly, the appellants should have recognized that it was.

Woods' conduct readily satisfies the relatedness plus continuity test of *H.J. Inc.* It was shown that over a four year period he repeatedly solicited and accepted bribes in connection with public matters. By any standard his activities were sufficiently related to satisfy RICO, given the consistency of his activities in methods, purposes, results and participants. Thus, he accepted bribes from Ablebuilt, through Hartman, in return for his influence as a City Council member in matters concerning public housing construction and renovation contracts with the Housing Authority of the City of Pittsburgh and with the Redevelopment Authority. He solicited and accepted bribes from Ablebuilt, through Hartman, to secure early progress payments on work done for the Housing Authority and he solicited and accepted a bribe from Ablebuilt and Hartman for his influence in licensing Hartman's brother as an electrician for purposes of work on city contracts. Furthermore, he interceded on Hartman's behalf in his negotiations with the Redevelopment Authority. In addition, Woods solicited and accepted bribes from Wozniak for his influence in securing sales of Wozniak's products for use in public projects of the City of Pittsburgh, the Housing Authority and other public agencies.

Woods' conduct also easily satisfies the continuity requirement of *H.J. Inc.*. The four years over which these related racketeering acts were committed constitutes a substantial period of time. Accordingly, under *H.J. Inc.*'s relatedness and continuity test, a pattern of racketeering activity obviously existed, thus bringing Woods' course of conduct squarely within the purview of RICO.

Ablebuilt and Hartman were also charged with conduct easily meeting the *H.J. Inc.* relatedness plus continuity test. Ablebuilt and Hartman were charged with multiple racketeering acts of bribery and, in fact, they bribed Woods on many occasions over an extended period. As with Woods, the racketeering acts are sufficiently related to satisfy RICO given the sim-

ilarity of the methods, goals, results, and identity of the parties. They bribed Woods in return for his influence in matters concerning construction contracts with the Housing Authority of Pittsburgh and for his assistance in matters concerning construction contracts with the Urban Redevelopment Authority. Furthermore, they bribed Woods in the matter of licensing Hartman's brother for electrical work on city projects.

The continuity of these related acts is also established given the substantial period of time over which the acts were committed. Accordingly, because the racketeering activity of Ablebuilt and Hartman, being both related and continuous, constitutes a pattern of racketeering activity which RICO clearly prohibits, RICO was not unconstitutionally vague as to them.[19]

> In *Pungitore*, we indicated that:
>
> Unlike in *H.J., Inc.,* which involved allegations of corruption within the ranks of a legitimate business, the application of RICO to the activities of the Scarfo crime family could not have come as a surprise to the members of the family. In fact, we have doubts that a successful vagueness challenge to RICO ever could be raised by defendants in an organized crime case. Certainly appellants' attempt to do so has been singularly unpersuasive.

*Pungitore,* at 1105.

We think that much the same thing can be said in this political corruption case. The application of RICO to the activities of these defendants should not have come as a surprise to them. Whatever might be true in other cases, 18 U.S.C. § 1962(c) is not unconstitutional when applied in this ongoing, hardcore political corruption case.

## III. THE REMAINING ISSUES

Appellants have raised the following additional issues:

1. The tape recordings made by Bilotta should have been suppressed;

2. At Count 3, the evidence was insufficient to prove the required nexus between appellants, the enterprise and the racketeering activity;

3. At Count 3, the court impermissibly broadened the bases for conviction by instructing the jury that any exercise of discretion by Woods as a public servant was sufficient to support conviction of the predicate offenses;

4. Under the Hobbs Act, the evidence was insufficient to prove that Woods exploited the inherently coercive power of his office to obtain money from Wozniak or Hartman;

5. The trial court improperly restricted cross-examination of Bilotta, a principal government witness;

6. In applying the sentencing guidelines to Woods' conviction of tax violations, the court erred in applying a four-level increase for his role in the offense;

7. In applying the sentencing guidelines to Hartman's conviction for conspiracy at Count one, the court erred in applying a two-level increase for his role in the offense;

8. The government abused statutory construction doctrine in its effort to rewrite section 2515 of the Wiretap Act.

We have carefully examined these contentions under the appropriate standards of review and have concluded they are clearly without merit.

## IV. CONCLUSION

Having concluded that appellants' convictions under RICO were not a deprivation of due process of law, and that their other objections are not meritorious, we will affirm the judgments of conviction and sentence on all counts.

---

**19.** Appellants also urge that 18 Pa.Cons.Stat. Ann. § 4701 (Purdon 1983), the Pennsylvania bribery statute the violation of which was re-ferred to in racketeering activity charged in Count 3, is unconstitutionally vague. We reject this contention.