**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lewis M. DISCHNER, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carl W. MATHISEN, Defendant–
Appellant.**

Nos. 89–30333, 89–30334.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 20, 1991.

Decided April 3, 1992.

As Amended on Denial of Rehearing
and Rehearing En Banc Sept. 11, 1992.

Stephen F. Frost, Bellevue, Wash., for defendant-appellant Mathisen.

Karen L. Loeffler, Asst. U.S. Atty., Anchorage, Alaska, for plaintiff-appellee.

Before: TANG, REINHARDT, and RYMER, Circuit Judges

### ORDER

The opinion filed April 3, 1992 (960 F.2d 870) is amended as follows:

With the above amendments, the panel has voted to deny the petitions for rehearing and to reject the suggestions for rehearing en banc.

The full court has been advised of the suggestions for rehearing en banc, and no judge of the court has requested a vote on them. Fed.R.App.P. 35(b).

The petitions for rehearing are DENIED and the suggestions for rehearing are REJECTED.

### OPINION

RYMER, Circuit Judge:

These are consolidated appeals from convictions on jury verdicts rendered after an eight-month trial. Lewis Dischner and Carl Mathisen were found guilty of violating the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1963, conspiracy to violate RICO, 18 U.S.C. § 1962(d), extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and violating the Travel Act, 18 U.S.C. § 1952. We affirm.

### Factual Background[1]

This case arises out of an investigation of corruption in the Office of the Mayor and the Department of Public Works of

Douglas Pope, Wagstaff, Pope & Clocksin, Anchorage, Alaska, for defendant-appellant Dischner.

---

1. Inasmuch as the jury convicted Dischner and Mathisen on a variety of charges, we sketch the facts in the light most favorable to the government.

Alaska's North Slope Borough during the tenure of Mayor C. Eugene Brower, who served as mayor from 1981 to October 1984. During his administration, Brower accelerated a large-scale public works and capital improvements program. Under this program, the Borough contracted for and administered construction projects in an effort to build warehouses, fire stations, health clinics, sewage and waste treatment plants, and other facilities in villages throughout the Borough. The Department of Public Works, headed by Irving Igtanloc, ran the program and spent $700 million on the various projects during Brower's three-year term.

Soon after his election, Brower entered into public service agreements with Lewis Dischner and Carl Mathisen, two of his close friends, hiring them as advisors and consultants to the Mayor and the Department of Public Works. While both had worked for the Borough prior to Brower's election, Dischner as a lobbyist in Juneau and Mathisen as a consultant, their influence over the Borough's affairs increased significantly because of their close personal friendship with Brower and Igtanloc. Dischner continued his work as a Borough lobbyist, but he became Brower's primary advisor on matters relating to the capital improvements program. Mathisen was the Mayor's special assistant in connection with the business of the Department of Public Works, where he served as Brower's representative in connection with public works and capital improvements.

Dischner and Mathisen gave Brower gifts such as a ten carat diamond ring and the use of a house in Anchorage. They tapped their influence with him and their power over Borough affairs to steer public works contracts to companies in which they owned or had a financial interest, as well as to obtain no bid contracts for contractors, suppliers, and design, construction, and engineering firms from whom they received substantial kickbacks. These companies, referred to as the "ten percent" companies, paid Dischner (who typically split the commissions with Mathisen) ten percent of their gross receipts from the Borough, an amount that was typically added on to prices charged the Borough. As one witness testified at trial, if you wanted to work on the North Slope Borough, "you had to pay Lew Dischner."

Borough officials accepted Dischner's and Mathisen's directions in handling contracting and other matters, and Brower took their advice on matters relating to public works. Mathisen and Dischner used their influence to prevent the Borough from looking into price quotes from contractors and the ownership of companies being awarded contracts. They also concealed their personal interest in some of the companies receiving contracts, and refused to allow conflict of interest and disclosure provisions to be inserted into standard Borough contracts. Chris Mello, the Borough contracts administrator, testified that "in the Brower administration Public Works business was conducted according to defendant Mathisen's wishes as we best understood them." Borough contractors paid Dischner's ten percent commission to sustain the flow of Borough business and ensure themselves a slice of the capital improvements pie.

On November 10, 1987, the grand jury returned a thirty-six count indictment against Dischner and Mathisen. The indictment charged that they conducted the affairs of the Office of the Mayor and the Department of Public Works through a pattern of racketeering activity in violation of RICO. It described numerous acts of racketeering, including offering items of value to Mayor Brower with the intent to influence his exercise of official discretion, as well as receiving money and property with the intent to violate their own fiduciary duties to the Borough, in violation of Alaska's commercial bribe receiving statute, Alaska Stat. § 11.46.660. The indictment further charged a conspiracy to violate RICO; several counts of extortion, based on the inducement of payments from various contractors under the threat that they would not continue to receive contracts from the Borough if they did not pay Dischner or Mathisen; fifteen counts of mail and wire fraud; and four counts of Travel Act violations. Dischner also was

charged with filing false tax returns, in violation of 26 U.S.C. § 7206(1), and failure to file tax returns, in violation of 26 U.S.C. § 7203.

The defense filed a number of motions before trial. Relevant to this appeal are their motions to dismiss the RICO counts on the ground that RICO is unconstitutionally vague, to strike the bribery predicate acts on the ground that the Alaska commercial bribe receiving statute is unconstitutionally vague, and their motion to dismiss the mail and wire fraud counts because the indictment included impermissible "intangible rights" allegations. The district court denied each of these motions. Due to the considerable media attention surrounding the investigation of North Slope Borough corruption, Dischner and Mathisen also claimed that prejudicial pretrial publicity required a change of venue. The district court denied these requests and held that a change of venue was not warranted.[2]

On May 22, 1989, following an eight-month trial, the jury returned guilty verdicts on counts charging Dischner and Mathisen with RICO violations and conspiracy to violate RICO, three counts of extortion, fifteen counts of mail and wire fraud, and one count of interstate travel in aid of racketeering in violation of the Travel Act. The jury also convicted Mathisen of one more count of extortion, and acquitted both Mathisen and Dischner of five counts of wire fraud and three counts of Travel Act violations. The jury acquitted Dischner of the tax charges.

On October 18, 1989, the district court sentenced both Mathisen and Dischner to seven years imprisonment on the RICO and RICO conspiracy counts, and five years on each of the remaining counts, with all sentences to run concurrently. Under 18 U.S.C. § 1963(a), the district court also ordered Dischner and Mathisen to forfeit $5,863,260 and $5,749,808, respectively, the proceeds of their illegal activity. Both defendants timely appealed their convictions, and the district court granted bail pending appeal.

### I. Constitutionality of RICO

Mathisen and Dischner challenge their RICO convictions on the grounds that the RICO statute, 18 U.S.C. §§ 1961–1963, is unconstitutionally vague on its face and as applied.[3] They complain that the terms "associated with," "enterprise," "conduct," "participate," "indirectly," "affairs," and "pattern of racketeering activity" provide no guidance as to what conduct the statute prohibits, resulting in virtually unlimited discretion for judges and law enforcement officials. In the context of this political corruption case, we remain unpersuaded.

Vagueness challenges to RICO have been uniformly rejected by this circuit and every other that has considered the issue. *See United States v. DeRosa*, 670 F.2d 889, 895 (9th Cir.) ("This claim has been rejected not only by this circuit, but also by every other circuit that has considered it. It merits no further discussion." (citations omitted)), *cert. denied*, 459 U.S. 993, 1014, 103 S.Ct. 353, 372, 74 L.Ed.2d 391, 507 (1982); *United States v. Campanale*, 518 F.2d 352, 364–65 (9th Cir.1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); *see also United States v. Tripp*, 782 F.2d 38, 42 (6th Cir.) (collecting cases), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1656, 90 L.Ed.2d 199 (1986).

We would not give the issue further attention were it not for Justice Scalia's concurring opinion in *H.J., Inc. v. Northwest-*

---

**2.** This was a long and complex case. From its inception, Judge Fitzgerald's rulings comprehensively and carefully set out his findings and the reasoning in support of his conclusions. This helped to focus the issues at trial, and facilitated our task on appeal.

**3.** 18 U.S.C. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(d) provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

*ern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In *H.J.,* the Court considered what conduct satisfies RICO's requirement of a "pattern" of racketeering activity.[4] Based on its reading of the legislative history, the Court concluded that Congress intended that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J.,* 492 U.S. at 239, 109 S.Ct. at 2900. It thus adopted the "continuity plus relationship" formula suggested in *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), to determine whether a pattern exists.

*H.J.* held that relatedness is established where the predicate acts charged "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J.,* 492 U.S. at 240, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)). While the Court admittedly found it "difficult to formulate in the abstract any general test for continuity," it did "begin to delineate the requirement." *Id.* at 241, 109 S.Ct. at 2901. Continuity is essentially a temporal concept that can be established by proving a series of related predicate acts extending over a substantial period of time. If such acts extend over only a short period, the requirement can be met when the nature of the acts themselves demonstrates the *threat* of continued racketeering. *Id.* at 242, 109 S.Ct. at 2902. The Court also indicated that the determination of a pattern will depend heavily on the facts of each case and noted that "[t]he development of these concepts must await future cases, absent a decision by Congress to revisit RICO to provide clearer guidance as to the Act's intended scope." *Id.* at 243, 109 S.Ct. at 2902.

Justice Scalia criticized the majority's discussion of the pattern requirement for "add[ing] nothing to improve our prior guidance, which has created a kaleidoscope of Circuit positions." *Id.* at 255, 109 S.Ct. at 2908 (Scalia, J., concurring in the judgment). In his view the RICO morass, already "intolerable," was exacerbated by the Court's opinion. *Id.* He then wrote:

> No constitutional challenge to this law has been raised in the present case, and so that issue is not before us. That the highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when that challenge is presented.

*Id.* at 255–56, 109 S.Ct. at 2909. Dischner and Mathisen, like many other RICO defendants, have seized upon Justice Scalia's comments and now present us with the constitutional challenge.

We have not revisited whether RICO is unconstitutionally vague since *H.J.* The First, Second, Third, and Seventh Circuits have done so, and have rejected a vagueness challenge, as has the Eleventh Circuit in passing. *See United States v. Van Dorn,* 925 F.2d 1331, 1334 n. 2 (11th Cir. 1991) (among issues described as "completely lacking in merit" was whether RICO statute is unconstitutionally vague); *United States v. Glecier,* 923 F.2d 496, 497 n. 1 (7th Cir.) ("We also join the First and Third Circuits in re-affirming that the RICO statute is not unconstitutional despite Justice Scalia's statements [in *H.J.*]."), *cert. denied,* — U.S. —, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991); *United States v. Coiro,* 922 F.2d 1008, 1017 (2d Cir.) ("We have previously found that RICO was not unconstitutionally vague in a variety of applications, and we so find here, notwithstanding comments in the concurring opinion in *H.J. Inc.*" (citations omitted)), *cert. denied,* — U.S. —, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *United States v. Woods,* 915 F.2d 854, 862–64 (3d Cir.1990) ("Whatever might be true in other cases, 18 U.S.C. § 1962(c) is not uncon-

---

**4.** RICO defines "racketeering activity" to mean "any act or threat involving" specified state-law crimes, any "act" indictable under various specified federal statutes, and certain federal "of-

fenses." 18 U.S.C. § 1961(1). A "pattern" requires "at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5).

stitutional when applied in this ongoing, hardcore political corruption case."), *cert. denied*, —— U.S. ——, 111 S.Ct. 1413, 113 L.Ed.2d 466 (1991); *United States v. Pungitore*, 910 F.2d 1084, 1102–05 (3d Cir.1990) (potential problems noted by Justice Scalia not present in organized crime cases; vagueness challenge "singularly unpersuasive"), *cert. denied*, —— U.S. ——, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); *United States v. Angiulo*, 897 F.2d 1169, 1178–80 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). We join these circuits in rejecting the vagueness challenge to RICO as applied in this case.

■■■■ "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *see also United States v. Tabacca*, 924 F.2d 906, 912 (9th Cir.1991); *United States v. Vasarajs*, 908 F.2d 443, 448–49 (9th Cir. 1990). Outside the first amendment context, however, a defendant has standing to raise a vagueness challenge only if the statute is vague as applied to his or her specific conduct. *Chapman v. United States*, —— U.S. ——, 111 S.Ct. 1919, 1929, 114 L.Ed.2d 524 (1991) ("First Amendment freedoms are not infringed by [the statute], so the vagueness claim must be evaluated as the statute is applied to the facts of this case."); *United States v. Hogue*, 752 F.2d 1503, 1504 (9th Cir.1985).[5] As we conclude below, there is no substantial basis for a first amendment challenge in this case. Therefore, we "need only examine the vagueness challenge under the facts of the particular case and decide whether, under a reasonable construction of the statute, the conduct in question is prohibited." *United*

*States v. Fitzgerald*, 882 F.2d 397, 398 (9th Cir.1989); *see also Woods*, 915 F.2d at 862.

■■■ Dischner and Mathisen contend that RICO does not define the prohibited conduct in sufficient detail. Yet neither offers any specific argument as to why the statute did not adequately warn them that their particular conduct is prohibited. We agree with the district court that Dischner's and Mathisen's use of their relationships with the Mayor and the North Slope Borough to commit repeated acts of extortion and bribery is within the hardcore of racketeering conduct prohibited by the statute.

■■■ Evidence that Dischner and Mathisen repeatedly solicited and accepted bribes in connection with public matters, and received substantial kickbacks from the "ten percent companies" for steering public works contracts in their direction, satisfies RICO's requirement of a "pattern of racketeering activity." Given the consistency of their methods, purposes, results, and the participants involved, the predicate acts were sufficiently related. These acts also were committed over a substantial period of time and demonstrated a threat of continued racketeering. Because of what they said and did, various contractors were led to believe that they had to keep paying kickbacks in order to continue to receive the Borough's business. Persons of ordinary intelligence would be aware that this kind of conduct constitutes a "pattern" of activity such that the application of RICO to their schemes "could not have come as a surprise." *Pungitore*, 910 F.2d at 1105.

We also are influenced by the fact that this is a political corruption case. It is obvious that receiving bribes and kickbacks on public contracts is criminally culpable, and that repeated over time, such activities feed on themselves so as to become a pat-

---

5. A facial challenge is only permitted when the law reaches "a substantial amount of constitutionally protected conduct" or "is impermissibly vague in all of its applications." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). A plaintiff "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1346 (9th Cir.1984) (quoting *Flipside*, 455 U.S. at 494–495, 102 S.Ct. at 1191).

tern. No matter what concerns may exist about RICO's reach in other cases, we believe they are not compelling in this kind of case. In this view we join the Third Circuit, which had occasion to reject a vagueness challenge on similar facts. *Woods,* 915 F.2d at 863. In *Woods,* the defendant repeatedly solicited and accepted bribes in connection with public matters, and obtained kickbacks for influencing certain public contracts. The court held that the defendant's vagueness challenged failed because his conduct fit squarely within RICO's pattern requirement. In so doing, it drew on *Pungitore,* where that circuit had previously registered "doubts that a successful vagueness challenge to RICO ever could be raised by defendants in an organized crime case," *Woods,* 915 F.2d at 864 (quoting *Pungitore,* 910 F.2d at 1105), and by analogy commented that "much the same thing can be said in this political corruption case." *Id. See also Coiro,* 922 F.2d at 1017; *Angiulo,* 897 F.2d at 1180.

■ Nor do we find the "enterprise" requirement vague as applied to Dischner's and Mathisen's conduct. *See United States v. Coonan,* 938 F.2d 1553 (2d Cir. 1991) (rejecting vagueness challenge to RICO's enterprise requirement), *cert. denied,* — U.S. —, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992). An enterprise includes a "group of individuals associated in fact," 18 U.S.C. § 1961(4), that is, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). The statute adequately warned Dischner and Mathisen that their association with each other and the Office of the Mayor and the Department of Public Works constituted a RICO enterprise.

Accordingly, we hold that the RICO statute is not unconstitutionally vague as applied to the conduct charged in counts one and two.

## II. Constitutionality of Alaska Stat. § 11.46.660

Trying to knock out a number of predicate acts underlying their RICO and Travel Act convictions, Dischner and Mathisen contend that Alaska's commercial bribe receiving statute, Alaska Stat. § 11.46.660, is unconstitutionally vague.[6] The statute provides that:

> A person commits the crime of commercial bribe receiving if the person solicits, accepts, or agrees to accept a benefit with intent to violate a duty to which that person is subject as (1) an agent or employee of another;
>
> . . . .
>
> (3) a lawyer, physician, accountant, appraiser, or other professional advisor;
>
> . . .

Alaska Stat. § 11.46.660(a). A "benefit" is defined as "a present or future gain or advantage to the beneficiary or to a third person pursuant to the desire or consent of the beneficiary." Alaska Stat. § 11.81.-900(b)(2).

Dischner argues that the statute is vague both on its face and as applied because it fails to provide adequate notice of what conduct is prohibited and it invites arbitrary enforcement. Mathisen argues that the terms "benefit," "gain or advantage," "duty to which that person is subject," "agent," and "professional advisor" are vague and overbroad. We reject their claims of unconstitutional vagueness.

■ First, their facial challenge is unavailing. As discussed in connection with the RICO counts, a facial challenge is permitted when the statute restricts first amendment freedoms, or reaches "a substantial amount of constitutionally protected conduct." *Kolender,* 461 U.S. at 358 n. 8, 103 S.Ct. at 1859 n. 8 (quoting *Flipside,* 455 U.S. at 494, 102 S.Ct. at 1191). The bribery statute does not infringe first amendment freedoms, and it neither chills, nor is intended to chill, constitutionally pro-

---

**6.** Dischner and Mathisen moved to dismiss on the ground that the Alaska statute was too vague to serve as the predicate for a RICO or Travel Act violation. The district court denied the mo-

tion, and, as evidenced by special verdicts, the jury found Dischner and Mathisen guilty of nineteen acts of commercial bribe receiving in violation of Alaska Stat. § 11.46.660.

tected activity.[7] Therefore, Dischner and Mathisen may only challenge the statute as vague as applied to their specific conduct. *Chapman,* —— U.S. at ——, 111 S.Ct. at 1929; *Schwartzmiller,* 752 F.2d at 1346.

Even so, their contention that the statute is unconstitutionally vague as applied is without merit for the reasons set out in the Tenth Circuit's persuasive opinion in *United States v. Gaudreau,* 860 F.2d 357, 360–64 (10th Cir.1988). In that case, the court considered and rejected a vagueness challenge to Colorado's commercial bribery statute, almost identical to the Alaska statute at issue here,[8] in a similar factual context. Like the Gaudreaus, Dischner and Mathisen sold their influence over the award and management of public contracts for a price, with the intent to violate their duty to act in the best interests of the Borough. Alaska common law sufficiently apprised them of their fiduciary duties to the Borough, *see, e.g., Twelve Hundred "L" Street Corp. v. Inlet Co.,* 438 P.2d 708, 709 (Alaska 1968) ("A fiduciary relationship exists when one imposes a special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence."), and the scienter requirement of the statute "overcomes [their] objection that the [Alaska] statute may punish without fair warning to the accused." *Gaudreau,* 860 F.2d at 363.[9]

### III. Proceeding With Eleven–Person Jury Under Rule 23(b)

After six days of jury deliberations, the district court was informed that one of the jurors had an accident that would require significant surgery on her shoulder. The court learned from juror Brown's physician, through the Clerk's office, that she had broken her shoulder and may have crushed her shoulder socket. The surgery was scheduled for three days later, after which the juror would be in the hospital for two or three days and would be on medication. On the record and in open court, the district court informed the parties what it had learned. The government then moved to proceed with the remaining eleven jurors and the defense objected. After hearing the arguments of both sides, the district court excused juror Brown for

---

**7.** Mathisen does argue that because a "benefit" might include such things as support for public officials in future elections, the statute may impinge *legitimate political discourse* and therefore implicate first amendment concerns. The fact that the statute might reach first amendment activities is not sufficient; the statute must reach a *substantial* amount of constitutionally protected activity. *Kolender,* 461 U.S. at 358 n. 8, 103 S.Ct. at 1859 n. 8; *Flipside,* 455 U.S. at 494, 102 S.Ct. at 1191; *Broadrick v. Oklahoma,* 413 U.S. 601, 613–15, 93 S.Ct. 2908, 2916–17, 37 L.Ed.2d 830 (1973). No credible argument exists that that could occur here.

**8.** Both statutes are based on and nearly duplicate the American Law Institute's Model Penal Code § 224.8. Under the Colorado statute, a person commits the crime of commercial bribe receiving if he "solicits, accepts, or agrees to accept any benefit as consideration for knowingly violating or agreeing to violate a *duty of fidelity* to which he is subject" as an agent or employee. Colo.Rev.Stat. § 18–5–401(1) (emphasis added). The Colorado Supreme Court has interpreted "duty of fidelity" to mean "duty of loyalty" as the term has been defined at common law. *Gaudreau,* 860 F.2d at 361 (citing *People v. Lee,* 717 P.2d 493, 496 (Colo.1986)). Although the Alaska commercial bribery statute

at issue here only refers to the acceptance of a benefit with intent to violate a *"duty* to which that person is subject," (emphasis added) the intended meaning of the two statutes is the same. The commentary to the Alaska penal code states that the "five general classes [of individuals mentioned in the statute as being subject to a duty] are defined broadly to cover all areas where a *duty of fidelity* is owed." Alaska Senate Judiciary Committee, Commentary on the Alaska Revised Criminal Code, 47 Senate Journal Supp. at 60 (June 12, 1978) (*reprinted in* Alaska Dep't of Law, Criminal Div., Criminal Law Manual, at 3–173 (1985)) (emphasis added). The commentary also notes that the "nature and scope of such duties are defined by common and statutory law regulating or creating the various legal relationships involved." *Id.* (quoting Haw.Rev.Stat. § 708–880, commentary).

**9.** Even if the bribery predicate acts were nullified, reversal would not be required because several other predicate acts remain. The jury returned special verdicts finding Dischner guilty of racketeering acts 3 and 4 and counts 5, 6, and 7, and Mathisen guilty of racketeering acts 3, 4, 8, 11, and 15–33, and counts 3, 4, 6, and 7. *See Coonan,* 938 F.2d at 1565 (no reversal required because of other predicate acts).

cause under Fed.R.Crim.P. 23(b) and ordered the jury to continue its deliberations with eleven members.[10]

■ Dischner now claims that due process requires a hearing to determine the circumstances surrounding the juror's condition more precisely. In the district court, however, Dischner neither requested an evidentiary hearing, nor argued that one was required. Instead, Dischner conceded that he "certainly believe[d] the court's rendition of the facts," and argued only that the information before the court was insufficient to warrant excusing juror Brown. The district court disagreed, holding that it was satisfied that juror Brown had suffered a serious injury and that the delay in deliberations would be at least a week.

■ Once Dischner conceded the accuracy of the facts the district court reported, an evidentiary hearing would serve no purpose. The only question that remains, therefore, is whether the facts before the district court justify its decision to excuse the juror. We conclude that the district court did not abuse its discretion.

■ Rule 23(b) provides the district court with the discretion to excuse a juror and proceed with eleven jurors "if the court finds it necessary." Excusing a juror is generally appropriate when the trial is lengthy and waiting for the juror will result in a substantial or potentially uncertain delay. *See Tabacca,* 924 F.2d at 913–15 (excusing juror appropriate when trial is lengthy and/or delay in waiting for juror is substantial or potentially uncertain; one-day wait for juror who had given car keys to his wife insufficient). Here, the district court learned that juror Brown had been seriously injured and that because of the medical treatment she required, the jury would have to stand down for at least four days to a week, and that it could not be ascertained how long she would be unavailable. After an eight-month trial, the district court could find that proceeding with an eleven-person jury was the preferable

alternative. *See United States v. Wilson,* 894 F.2d 1245 (11th Cir.) (nine-week trial; ill juror who would be out a few days and it was uncertain when the juror would be better and able to return), *cert. denied,* —— U.S. ——, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990); *United States v. Armijo,* 834 F.2d 132 (8th Cir.1987) (five-day trial; juror involved in car accident would be out at least until the following week), *cert. denied,* 485 U.S. 990, 991, 108 S.Ct. 1297, 99 L.Ed.2d 507 (1988); *United States v. Stratton,* 779 F.2d 820 (2d Cir.1985) (four-and-a-half-day delay for juror who insisted on observing religious holiday constituted just cause), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726, *and cert. denied,* 477 U.S. 906, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986).

■ Dischner also claims that he has a sixth amendment right to be present at the "critical" stage when the district court hears and evaluates information about the juror. We are unclear what this means, but we infer he claims a right to be present either when the clerk learns of the problem or when the judge is told what the clerk had been told, because he was in any event present when the judge passed on what he had learned and discussed it with counsel.

Dischner did not raise this issue in the district court, and we find no plain error in the trial judge's handling of the situation. The time when the clerk relays information to the judge in chambers is not a "stage" of the trial at which Fed.R.Crim.P. 43 requires the defendant to be present. No court proceeding took place, no decision was rendered, and Dischner was denied no opportunity to be heard. When the district court ruled, it ruled in open court and on the record after informing the parties of the facts it had learned, which Dischner conceded were accurate, and after considering arguments from all parties. The record for appeal was adequately developed, and both sides were present when the dis-

---

**10.** Rule 23(b) provides that "if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors."

trict court rendered its decision and explained its basis.[11]

### IV. Cross–Examination of Mayor Brower

 Dischner contends that his confrontation clause rights were infringed because the district court limited cross-examination of Mayor Brower, one of the government's key witnesses.[12] Mayor Brower testified pursuant to a plea agreement, which provided that he would not be asked questions regarding his family and would not be asked to testify against any member of his family. On cross-examination, the defense sought to ask Brower whether the government threatened to make public pictures of his wife (allegedly in the nude, taken before and after cosmetic surgery allegedly paid for by Dischner) unless he pled guilty. The government objected on the ground that there was no evidence that any threats were made. An offer of proof was made outside the presence of the jury, and after both sides questioned Brower about the pictures, the court declined to permit inquiry about threats.

We do not read the district court's ruling as denying Dischner the opportunity to cross-examine Brower about the impact the government's possession of photos of his wife had on his decision to plead in the case against him. It merely restricted the defense from inquiring into threats without a factual basis.[13] The defense was not generally restrained from inquiring into the voluntariness of Brower's plea or his own fear that the government might make private pictures public. This case therefore is unlike those where all cross-examination on

an important area of bias was cut off. *See, e.g., Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (per curiam) (error to prohibit all inquiry into rape victim's relationship with another man for purposes of exposing her motive to lie); *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (error to prohibit all inquiry into possibility that witness was biased as a result of the state's dismissal of pending public drunkenness charge); *Davis v. Alaska*, 415 U.S. 308, 320, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974) (defendant must be allowed to impeach credibility of prosecution witness by cross-examining him on potential bias deriving from witness's probationary status as a juvenile delinquent). In any event, the defense cross-examined Brower for three days, providing the jury with ample opportunity to judge Brower's possible biases and motivations. *See Bright v. Shimoda*, 819 F.2d 227, 229 (9th Cir.1987) ("When substantial cross-examination has taken place, courts are less inclined to find confrontation clause violations."), *cert. denied*, 485 U.S. 970, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988). Accordingly, we conclude that the district court did not improperly restrict cross-examination.

### V. Hobbs Act Jury Instructions

 Dischner argues that the instructions incorrectly set out the elements of extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, because they failed to require the government to prove that Dis-

---

**11.** This case is therefore unlike *United States v. Gay*, 522 F.2d 429, 435 (6th Cir.1975), cited by the defense at oral argument, in which the district judge engaged in discussions with members of the jury after it was impaneled and considered requests for excuses out of the presence of the defendant and without giving notice to defense counsel. The defendant thus had no opportunity to object to requests for excuses, and the lack of any record of the proceedings prevented meaningful appellate review. This case is not remotely comparable.

**12.** The trial court's decision to limit the scope of cross-examination is reviewed for an abuse of discretion. *United States v. Bonanno*, 852 F.2d 434, 439 (9th Cir.1988), *cert. denied*, 488 U.S.

1016, 109 S.Ct. 812, 102 L.Ed.2d 801 (1989). "Generally, once cross-examination reveals sufficient information with which to appraise a witness's possible bias and motives, confrontation demands are satisfied." *Id.*

**13.** As the judge put it: "[I]f it can be shown that the government agents or government representative made a threat to this witness to compel his cooperation I would admit it, but short of that I will not unless there is other evidence which will tend to connect the government agents or the representatives with making the statements." The proffer had elicited evidence of Brower's conversations with his own lawyer about the government's evidence, but none about threats by the government.

chner *knew* he was not lawfully entitled to the property.[14] He relies on the First Circuit's opinion in *United States v. Sturm,* 870 F.2d 769 (1st Cir.1989), to urge that the statute requires the government to prove that the defendant did not have any claim of right, and knew he was not legally entitled to the property in question.

Although Dischner asserts that objections were raised to the extortion instructions, the record provided to us fails to reflect an objection on this ground. We therefore review for plain error. *United States v. Bustillo,* 789 F.2d 1364, 1367 (9th Cir.1986). "A plain error is a highly prejudicial error affecting substantial rights." *Id.* (quoting *United States v. Giese,* 597 F.2d 1170, 1199 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). "The availability of a better instruction is not a ground for reversal," *United States v. Ward,* 914 F.2d 1340, 1344 (9th Cir.1990), and in determining the adequacy of jury instructions, we examine them in their entirety. *United States v. Feldman,* 788 F.2d 544, 555 (9th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

We require courts to instruct on the *mens rea* required by the Hobbs Act. *United States v. Aguon,* 851 F.2d 1158, 1168 (9th Cir.1988) (en banc) (*Aguon II*) ("[C]riminal intent must be submitted to the jury in a case charging extortion under the Hobbs Act.... The court's failure to give an instruction on a vital element of the crime was plain error.") (adopting language from *United States v. Aguon,* 813 F.2d 1413, 1419 (9th Cir.1987) (*Aguon I*)). In the case of extortion by inducing payment through fear of economic loss, however, we have not read other elements into the Act.[15] Dischner does not fault the court's instructions on criminal intent and, read as a whole, we believe they necessarily required a finding that Dischner knew he had no

right to the payments induced. For this reason we need not decide whether the government must prove that the defendant knew he had no entitlement.

The district court instructed that the jury must find beyond a reasonable doubt that (1) the defendant induced or attempted to induce the person described in the indictment to part with money or property; (2) the defendant did so knowingly and willfully by means of "extortion," as defined in the statute and in other instructions; and (3) the extortionate transaction delayed, interrupted, or adversely affected interstate commerce. The court then instructed that "[e]xtortion means to obtain money or property ... by the wrongful use or threat of fear of economic loss. To commit extortion the defendant must wrongfully induce the payment"; and "'wrongful' means to obtain money or property unfairly and unjustly by one having no lawful claim to it." *Id.* After this the court again stated: "You have been instructed that the Government must prove that the particular defendant knowingly and willfully induced a payment, and that he knowingly and willfully did so by means of extortion."

Under these instructions the jury had to find that Dischner knowingly induced the payment of money to which he had no lawful claim by the use or threat of fear of economic loss. If Dischner knew he was extorting money—that is, he knowingly and willfully was obtaining money to which he had no lawful claim—then he necessarily knew that he had no lawful claim to it. Knowledge of the extortion encompasses knowledge of the lack of lawful claim to the property. Thus, even on Dischner's theory the error would be harmless.

## VI. Sufficiency of Evidence for Extortion Counts

Dischner contends the evidence was insufficient to convict on the Hobbs Act

---

**14.** The defense theory was that the Hobbs Act counts charged Dischner with extorting money that was due or owing either to him or to a company in which he had an ownership interest.

**15.** Because the case did not go to the jury on a "color of official right" theory, the additional

requirement that we recently imposed in such a case, that the defendant "make an explicit promise to carry out official actions or inaction on behalf of constituents in exchange for the making of payments", is inapplicable. *See United States v. Montoya,* 945 F.2d 1068, 1074 (9th Cir.1991).

counts. The evidence is sufficient if, viewing it in the light most favorable to the government, any reasonable jury could find the elements of the crime beyond a reasonable doubt. *United States v. Adler,* 879 F.2d 491, 495 (9th Cir.1988).

"The elements of a Hobbs Act violation are extortion and a nexus with interstate commerce." *United States v. Zemek,* 634 F.2d 1159, 1173 (9th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981). The statute defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Obtaining property is generally "wrongful" if the alleged extortionist has no lawful claim to that property. *United States v. Enmons,* 410 U.S. 396, 400, 93 S.Ct. 1007, 1010, 35 L.Ed.2d 379 (1973). Criminal intent must also be shown. *Aguon II,* 851 F.2d at 1168.

Thus, in order to prove extortion by wrongful use of force or fear, the government must establish that (1) the defendant induced someone to part with money, property, or other valuable right by the wrongful use or threat of force or fear; (2) the defendant acted with the intent to obtain money or property that defendant knew he was not entitled to receive; and (3) commerce from one state to another was or would have been affected in some way. *See Manual of Model Jury Instructions for the Ninth Circuit,* Instruction 8.31A at 212 (1989).

## A. *Count Five*

Count five involved a $19,000 payment from William Fowler, President of Alaska International Construction (AIC), to Dischner in the spring of 1983. AIC was involved in a water and sewer project in the Borough. At some point during the project, Dischner learned from Dana Pruhs, a governmental affairs liaison and lobbyist for Enserch Corp. (the owner of AIC), that AIC had purchased $119,000 of materials from a vendor other than the one specified

in the contract. As a result, Dischner did not receive his ten percent cut.

Pruhs testified, under a grant of immunity, that Dischner was upset about this. According to Pruhs, Dischner indicated that he had lost a commission of $19,000 and stated that he "didn't know why he should continue to help Bill Fowler and his construction company when he would do things like this." Pruhs took the statement seriously because he wanted his company to continue to get work in the Borough. Because he "didn't need to see Mr. Fowler or the construction company be in a bad light with Mr. Dischner," Pruhs told Fowler that Dischner was upset. Fowler then approved payment of $19,000 to Dischner to take care of this "problem." Fowler testified that he made the payment because he did not want Dischner angry with Enserch and its companies. Fowler also commented that alienating Dischner "certainly could affect the future business of all our companies." The payment was sent to Dischner via Fowler's brother's company, and the two brothers falsified documents to cover it up.

Dischner argues that this does not prove extortion by inducing payment through fear of economic loss for two reasons: first, the evidence shows that Fowler made the payment not out of a concern that Dischner was threatening to harm his company economically, but out of a concern that Dischner would not help him in the future; and second, it does not show that Dischner had no claim of right and knew he had no lawful right to the payment.

The jury unquestionably could conclude that Dischner had no claim of right to a ten percent commission on business he had nothing to do with, and that he knew it. Dischner's other argument is more troublesome. He relies on *United States v. Garcia,* 907 F.2d 380 (2d Cir.1990), to urge that the possibility of losing future business distinguishes his case from those where harm was feared and extortion was found. *See also United States v. Capo,* 817 F.2d 947 (2d Cir.1987); *cf. United States v. Bucci,* 839 F.2d 825 (1st Cir.) (affirming conviction of head of city's legal department and

aide to the Mayor whom person making payment knew could get him out of doing business with the city as easily as he got him in), *cert. denied,* 488 U.S. 844, 109 S.Ct. 117, 102 L.Ed.2d 91 (1988). We need not resolve whether fear of the loss of an ongoing business relationship suffices, however, because the instructions defined "fear" as including "fear of economic loss including the possibility of lost business opportunities." Dischner neither objected to this instruction nor cites it as error on appeal. The evidence overall was more than sufficient for the jury to conclude that Fowler made a $19,000 "kickback" payment out of a reasonable fear that Dischner would otherwise adversely affect his business opportunities.

**B.** *Counts Six and Seven*

Counts six and seven involved payments from two individuals to Dischner and Mathisen through their company Tri-Leasing. The payments came about in this way: Pruhs suggested to Dischner in the summer of 1984 that the various airplanes contractors used to fly their people to the North Slope Borough be consolidated. Dischner suggested that Mathisen be brought into the deal. The idea was to lease a plane, with an option to buy after Mayor Brower won reelection in 1984. Mathisen and Dischner tapped their influence with Mayor Brower and required contractors to use the Tri-Leasing jet if they wanted their transportation costs reimbursed by the Borough. Tri-Leasing drew up contracts that required the contractors to pay nonrefundable advance payments for future transportation services. If Brower lost the election, Dischner and Mathisen would pocket the advances; if Brower won, the Borough would buy them a jet for their use. The contractors did not like the plan, nor did they want to pay the nonrefundable advances.

After Brower lost the election (and before the new Mayor took office), Fowler still owed a deposit to Tri-Leasing. Mathisen told Pruhs to collect. Pruhs then told Fowler, "How do you expect to get your bills paid if you don't pay your bills?" Fowler, who had submitted a request to get $235,000 in expenses reimbursed from the Borough but had not yet been paid, immediately wrote out a personal check for $210,000 and delivered the remaining $25,000 to Dischner and Mathisen at Dischner's home in Palm Springs.

Dischner contends that the evidence does not show that he had any role in inducing the payment. We disagree. Not only did the evidence show how Dischner handled Borough construction contract awards and the ten percent kickbacks from various contractors, including Fowler, but there was substantial evidence detailing Dischner's dominant role in the Tri-Leasing scheme. The plane's ID number was LD 88 (Dischner's initials and the year in which the plane would be paid off), and Dischner made a $140,000 profit in the one-and-a-half-months of Tri-Leasing's operation. From this, together with evidence that Fowler personally delivered the rest of the payment to Dischner and Mathisen at Dischner's home, and that Dischner himself demanded a Tri-Leasing payment from another contractor, as charged in count seven, the jury could find beyond a reasonable doubt that Dischner was involved in inducing the $235,000 payment from Fowler.

Dischner also contends that the evidence fails to demonstrate that he knew he did not have a lawful claim to the money. Even though the contracts between the contractors and Tri-Leasing give Tri-Leasing the right to nonrefundable advances, the jury could conclude that the payment was wrongful. There was strong evidence that Fowler's fear of economic loss motivated him to sign up with Tri-Leasing in the first place, most notably that a contract Fowler had with the Borough was held up until he signed the Tri-Leasing agreement. Therefore, despite the fact that Dischner may have had a "right" to the money under the contract, the underlying contract was procured by extortion. Dischner can have no lawful claim to the proceeds of an extortionate transaction.

We also believe the evidence on count seven, charging that Dischner extorted $335,000 from MMCW Consultants (a joint venture between two companies, McCool–

McDonald Architects and Coffman White Engineering) and its director, Joe Brock, was sufficient. Before Brower lost the election, Al McDonald had not made either the initial $275,000 nonrefundable advance payment or the first $50,000 monthly payment. Dischner told Brock that he was angry because McDonald had not made the payments, and "if Mr. McDonald didn't make that payment they'd see that he didn't do any more work in Alaska." Although Brock testified that in retrospect, he did not take the threat seriously, he relayed the message to McDonald. Dischner's statement, when viewed in light of his other conduct, constitutes sufficient evidence that MMCW's payment was wrongfully induced by a reasonable fear of economic loss.

## VII. *McNally* "Intangible Rights" Claim

Dischner and Mathisen challenge their convictions for mail and wire fraud on the grounds that the indictment impermissibly made "intangible rights" allegations, and that the instructions permitted the jury to convict upon finding that the defendants deprived the Borough and its citizens only of their right to honest government, without finding that they defrauded the Borough of money or property. In particular, they argue that the indictment and instructions run afoul of *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).[16]

In *McNally*, the Court held that the mail fraud statute then in effect did not protect "the intangible right of the citizenry to

good government," 483 U.S. at 356, 107 S.Ct. at 2879, but was "limited in scope to the protection of property rights." *Id.* at 360, 107 S.Ct. at 2882. As a result, the Court reversed mail fraud convictions based on a Kentucky official's participation in a scheme to direct commissions on insurance purchased by the state to an insurance agency in which the official had a financial stake. The indictment alleged, and the jury was instructed, that the scheme defrauded the citizens "of their right to have the Commonwealth's business and its affairs conducted honestly, impartially, free from corruption, bias, dishonesty, deceit, official misconduct, and fraud," but not money or property. *Id.* at 354 n. 4, 107 S.Ct. at 2884 n. 4. Because "there was no charge and the jury was not required to find that the Commonwealth itself was defrauded of any money or property[,] ... the jury instruction on the substantive mail fraud count permitted a conviction for conduct not within the reach of § 1341." *Id.* at 360–61, 107 S.Ct. at 2882.

### A. *The Indictment*

■■■■ Dischner and Mathisen contend that the indictment includes "intangible rights" allegations found deficient in *McNally*. The sufficiency of an indictment is reviewed de novo. *United States v. Soriano*, 880 F.2d 192, 195 (9th Cir.1989). The indictment also must be "read as a whole" and construed according to common sense. *United States v. Buckley*, 689 F.2d 893, 899 (9th Cir.1982), *cert. denied*, 460

---

**16.** The mail fraud statute in effect at the time of trial provided in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, ... [uses the mails] for the purpose of executing such scheme ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341. The wire fraud statute, 18 U.S.C. § 1343, uses the same language, but prohibits the use of wire, radio, or television communication in connection with the fraudulent scheme. The same analysis therefore applies to those counts as well. *Carpenter v. United States*, 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987) ("The mail and wire fraud

statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here."); *United States v. Oren*, 893 F.2d 1057, 1060 n. 1 (9th Cir.1990). *McNally* has since been nullified by statute. In November 1988, Congress added 18 U.S.C. § 1346, which provides: "For the purpose of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." This provision does not have retroactive application. *United States v. Telink, Inc.*, 910 F.2d 598, 601 n. 2 (9th Cir.1990) ("We follow the lead of the other circuits ..., all of which have held, for any number of reasons, that the section lacks retroactive force."). *McNally* and the cases interpreting it therefore apply in this case.

U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983).

█ In *McNally*, the indictment charged that the defendants devised a scheme to defraud the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly. The indictment here, by contrast, makes no mention of any impairment of the right to honest government or any other non-property right. Rather, it charges that Dischner and Mathisen devised a scheme to "defraud the government of the North Slope Borough of millions of dollars, through corruption, bribery, misrepresentation, fraud, conflict of interest and undue influence," and to "obtain ... money, objects of value, and property by means of false and fraudulent pretenses and concealment of facts"; caused the Borough "to issue contracts and change orders to business entities paying commercial bribes, kickbacks and payments ... at prices above what the services would have cost absent the influence ... causing the government of the North Slope Borough to be defrauded out of public monies"; and

> provide[d] advice to North Slope Borough public servants that was for the benefit of the private financial interests of the defendants, and contrary to the best interest of the North Slope Borough, thereby causing the government of the North Slope Borough to be defrauded out of monies paid to the defendants pursuant to their consulting and professional services contracts.

Dischner focuses on other paragraphs of the indictment that describe the scheme of corruption and influence peddling in terms which do not at the same time charge that the scheme was to defraud the Borough of money.[17] However, the presence of a few paragraphs that are descriptive of the background and context of the alleged scheme to defraud do not make an otherwise sufficient indictment vulnerable to a *McNally* challenge. Read as a whole, the indictment is not permeated with the impermissible pre-*McNally* "right to honest services" theory. This case is therefore unlike those in which we have held indictments defective. *See Telink*, 910 F.2d at 600 (indictment silent on how County defrauded of any property rights; dismissal proper because it charged mail fraud based on scheme to defraud government of honest services of employees, agents, and consultants); *Soriano*, 880 F.2d at 197 (indictment "permeated" with right to honest services theory); *United States v. Mitchell*, 867 F.2d 1232, 1233 (9th Cir.1989) ("pertinent portions of the indictment are nearly identical to those in *McNally*").

### B. *Jury Instructions*

█ Dischner and Mathisen also contend that the mail and wire fraud instructions erroneously permitted the jury to convict on a finding that they made false or fraudulent statements to North Slope Borough officials, thereby depriving the Borough of its intangible right to honest government, coupled with a finding that they had received money in the form of commission payments from companies doing business with the North Slope Borough. Dischner and Mathisen argue that this is contrary to *McNally* and to *United States v. Lew*, 875 F.2d 219 (9th Cir.1989), and that the indictment, instructions, and proof do not assure that the scheme had the result of effecting monetary or property losses as required by *United States v. Hilling*, 891 F.2d 205, 207–08 (9th Cir.1988).

---

17. These paragraphs charged:

8.3 It was part of said scheme and artifice that defendants, Lewis M. Dischner and Carl W. Mathisen, would assist in the elections of C. Eugene Brower and would cause others to give monies, benefits and objects of value to public servants of the North Slope Borough and their families so as to be able to influence the official decisions of these public servants.

8.5 It was further part of said scheme and artifice that defendants would ... and did conceal from public servants of the North Slope Borough the fact that they were receiving commercial bribes, kickbacks and payments from business entities receiving contracts and change orders from the North Slope Borough.

8.10 It was further a part of the scheme and artifice that the defendants ... would and did conceal from North Slope Borough public servants the true nature and extent of the interest in companies and entities doing business with the North Slope Borough.

■ "We review a claim of error in a jury instruction by looking to 'the adequacy of the entire charge ... in the context of the whole trial.'" *United States v. Mundi*, 892 F.2d 817, 818 (9th Cir.1989) (quoting *United States v. Marabelles*, 724 F.2d 1374, 1382 (9th Cir.1984)), *cert. denied,* —— U.S. ——, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991). Whether the instructions correctly explained the law and the elements of fraud is reviewed de novo. *Id.* However, "we may look beyond the instructions themselves and examine the indictment and the entire trial in context." *Id.* at 819.

Echoing the statute, the jury instructions explained that Mathisen and Dischner could be guilty of mail or wire fraud if they (1) devised a scheme or artifice to defraud another of money or property; or (2) obtained money or property by means of false pretenses, representations, or promises. The first prong poses no intangible rights problem. When describing the elements of a "scheme to defraud," the court instructed the jury that it must find "that the particular defendant made up a plan or scheme which was reasonably calculated to defraud the North Slope Borough of money."

With regard to the second prong, the court instructed that the jury must find

First, that the particular defendant made up a plan or scheme to obtain money or property by means of false pretenses or fraudulent statements or representations;

... and,

Fourth, that the particular defendant acted with the intention of obtaining money or property by means of false statements or representations.

Even though on this prong the court did not add "from [or to] North Slope Borough," we are satisfied that the indictment, the proof presented at trial, and the instructions assured that money or property interests were implicated. *Hilling*, 891 F.2d at 207. First, the jury was not specifically instructed that the defendants could defraud the Borough without intending to obtain money or property from it. In *Lew*, by contrast, the jury was instructed that the "scheme was to make false statements *to the United States* for the purpose of obtaining money *from defendant's clients.*" 875 F.2d at 221 (emphasis added). This explicitly permitted the jury to convict without finding that the defendant acted to obtain money or property from the government. No similar *McNally* error infects the court's instructions in this case.

Second, the indictment and proof point entirely toward defrauding the Borough of money or property. *Lew* is distinguishable in this respect as well. There, an immigration attorney made false statements in connection with applications for alien employment certificates he submitted to the Department of Labor (DOL). The attorney's clients, aliens seeking DOL certification to facilitate obtaining permanent resident status, paid the defendant for getting the certificates. There was no evidence that Lew deceived his clients. Even though Lew ultimately received money, his conviction could not stand under *McNally* because he had no intent to defraud the government of any money or property; he only deprived the government of intangible rights, a deprivation not within the reach of the mail fraud statute.

Unlike *Lew*, in this case the indictment charged, and evidence showed, that Dischner and Mathisen concealed their ownership interests in companies to which they awarded contracts; they obtained money from the Borough indirectly via companies that added Dischner's and Mathisen's fee on to the price they charged the Borough; and they obtained money directly from the Borough in the form of salaries for consulting services when they did not counsel the Borough in its best interests. Given the way the case was charged and tried, the jury could not have been confused as to the victim of the fraud. The contractors were not "deceived" because they knew exactly what was going on; they paid Dischner and Mathisen in order to get contracts for their companies. It was the Borough who got snookered and no other theory was presented to the jury.

■ Finally, Mathisen argues that the government failed to show that the Borough was a victim in the sense that it lost

money. We have repeatedly stated, however, that the fraud need not succeed and that no requirement exists that the victim of the fraud suffer actual loss. That the defendant acted with the intent to defraud is sufficient. *See Telink*, 910 F.2d at 600 ("Dismissal of the indictment cannot be grounded on failure to allege an actual loss of property."); *United States v. Oren*, 893 F.2d 1057, 1061 (9th Cir.1990) (rejecting "argument that wire fraud requires a government showing that the defendant caused an actual loss of money or property"); *United States v. Utz*, 886 F.2d 1148, 1151 (9th Cir.1989) ("It is enough after *McNally*, as before, that the government charge and the jury find either that the victim was actually deprived of money or property *or* that the defendant intended to defraud the victim of the same."), *cert. denied*, — U.S. —, 110 S.Ct. 3242, 111 L.Ed.2d 753 (1990). The government therefore did not have to prove, nor did the jury have to find, that the Borough actually lost money.

## VIII. Aiding and Abetting Travel Act Violation

■ Dischner contends that the evidence is insufficient to show that he aided and abetted a violation of the Travel Act, 18 U.S.C. § 1952 (based on a violation of the commercial bribe receiving statute, Alaska Stat. § 11.46.660 (1990)). Count thirty-one involved Mathisen's travel from Alaska to Seattle in order to collect a $113,000 payment owing from one of Geoff Fowler's companies, Pacific Management & Engineering (PM & E). This payment was alleged to have been one of the ten percent kickbacks, "the price for continuing business in the North Slope Borough." PM & E made the payment on a Friday, funneling it through McCool–McDonald Architects to Dischner's bank account on the following Monday. Dischner wrote a check to Mathisen for half of the payment that same day.

Given the evidence at trial concerning the ten percent payments, the relationship between Dischner and Mathisen, that the money was paid to Dischner, that Dischner paid Mathisen half the amount the same day, and that Dischner told Fowler that Mathisen appreciated the payment because he had to pay some taxes, the jury could properly find Dischner was a knowing participant in the travel to facilitate payment.

## IX. Expert Testimony

■ Dischner and Mathisen contend that expert testimony based on a "total cost theory" of assessing damages was erroneously admitted. They argue that the government's expert, Roger McAniff, was not a qualified expert on damages, and that his testimony impermissibly calculated damage on the hypothetical cost of a particular project instead of the costs actually incurred. They point to a number of cases in which this method of proving damages has been rejected. We review admission of expert testimony for an abuse of discretion or manifest error. *United States v. Dorotich*, 900 F.2d 192, 194 (9th Cir.1990).

The government qualified McAniff as an expert in engineering management,[18] and offered his testimony as a means to analyze the Borough's process of awarding contracts and its method of cost control. In order to shed light on these procedures, and to show how the defendants could have harmed the Borough because of the lack of any reasonable process to award contracts, and the lack of cost control procedures, McAniff opined what certain projects should have cost the Borough compared to the projects' actual costs.

While the total cost method has generally been disapproved in the civil context, *see Boyajian v. United States*, 191 Ct.Cl. 233, 423 F.2d 1231, 1235–42 (1970), McAniff was

---

18. Fed.R.Evid. 702 allows for testimony by experts if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *See United States v. Christophe*, 833 F.2d 1296, 1299 (9th Cir.1987). Given McAniff's education, training, and 25 years of extensive experience as an industrial engineer, the court did not abuse its discretion in concluding that

not trying to "assess" damages.[19] Rather, his testimony was offered to show that in light of how the Borough operated, the use of influence by Mathisen and Dischner, the addition of the ten percent kickbacks onto prices charged the Borough, the absence of negotiation, and the lack of cost control procedures may have caused the Borough to lose money. Such evidence is relevant, in that it goes to whether Dischner and Mathisen intended to defraud the Borough of money or property and whether they accepted benefits with the intent to violate duties to which they were subject. By the same token it was not unduly prejudicial, because only the fact of harm in the nature of a property loss is material, not the amount of damage. Admitting testimony based on the "total cost" approach was not an abuse of discretion.[20]

## X. Jury Voir Dire

■ Dischner and Mathisen contend that the district court erred in failing to read a complete list of government witnesses to the venirpersons during *voir dire*, thereby denying them a fair trial and an impartial jury. They argue that disclosure of all witnesses was necessary to enable the defense adequately to question prospective jurors about any possible connection with government witnesses and to uncover bias or prejudice. They also maintain that such disclosure is required by our decisions in *United States v. Washington*, 819 F.2d 221 (9th Cir.1987), and *United States v. Baldwin*, 607 F.2d 1295 (9th Cir.1979). We disagree.

■ The Supreme Court has recently reaffirmed that its "cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Mu'Min v. Virginia,* — U.S. —, —,

111 S.Ct. 1899, 1906, 114 L.Ed.2d 493 (1991). With this in mind, we review the sufficiency of *voir dire* questions for abuse of discretion. *Washington*, 819 F.2d at 223. "Discretion is not properly exercised if the questions are not reasonably sufficient to test the jury for bias or partiality." *Baldwin*, 607 F.2d at 1297.

*Voir dire* in this case was painstakingly thorough. Prospective jurors responded to a comprehensive questionnaire which included inquiry into connections with people or companies involved in the case; the district court conducted a preliminary examination; and counsel were permitted to undertake an extensive and individualized *voir dire* of each person on the venire. Almost all of the government's major witnesses were already known to the defense and their names were read to many prospective jurors;[21] as a result of the questionnaire it was apparent that other venirepersons lacked sufficient knowledge to make it worthwhile to question them about each and every prospective government witness. The process lasted three weeks. The court also gave the defense eight extra peremptory challenges. Indeed, Mathisen's counsel indicated that the court "virtually bent over backwards to try and obtain, or to assist us in obtaining [a fair and impartial jury], in terms of the time you've permitted voir dire and allowing individualized voir dire." We agree.

We have consistently held that in noncapital cases the government does not have to disclose the names of its witnesses prior to trial. *United States v. Steel*, 759 F.2d 706, 709 (9th Cir.1985) (citing cases). In *Baldwin* we found reversible error where the trial court refused to ask prospective jurors two questions: whether they would be biased in favor of testimony of law enforcement officers, and whether they

---

he had "specialized knowledge" that would help the jury.

**19.** In fact, the district court disregarded McAniff's specific estimates of loss on various projects at sentencing.

**20.** Mathisen urges that flaws in McAniff's opinions adduced on cross examination further war-

rants reversal. However, such points go to weight, not admissibility.

**21.** The defense had notice of the major witnesses from discovery, the indictment, resumes of the expert witnesses, the bill of particulars, and the coconspirator list.

were acquainted with any of the government's witnesses. *Baldwin,* 607 F.2d at 1298. In *Washington* we held that when witnesses have been disclosed, and counsel requests but the court refuses *any* questions concerning knowledge of *any* government witnesses, the court will have abused its discretion. *Washington,* 819 F.2d at 224. Neither *Baldwin* nor *Washington,* however, either requires disclosure of all witnesses or directs the trial court to question veniremen about every possible government witness. When, as here, considerable inquiry was permitted into connections between the prospective jurors and the North Slope Borough, companies and people involved in the case, and major government witnesses, the court did not abuse its discretion in declining to order a more fulsome disclosure or inquiry. For the same reasons, we cannot say that the trial was rendered fundamentally unfair. *See Mu'Min,* —— U.S. at——, 111 S.Ct. at 1905.

## XI. Change of Venue

Before trial and during and after voir dire, Mathisen moved for a change of venue under Fed.R.Crim.P. 21(a) because of extensive pretrial publicity. Dischner joined. The district court denied these motions in comprehensive orders.

Both claim that a presumption of prejudice arises from the 18,000 column inches in Alaskan newspapers devoted to the North Slope investigation between August 1985 and September 1988, the 70 opinion pieces and editorials regarding the investigation that appeared between August 1985 and September 1986, and the 177 news stories on Anchorage television stations concerning the events involved in the North Slope corruption scandal aired prior to jury selection. Dischner further contends that portions of the voir dire demonstrate actual prejudice in the jury pool.[22]

 In order to warrant a change in venue a defendant must establish either

presumed prejudice or actual prejudice. *United States v. Rewald,* 889 F.2d 836, 863 (9th Cir.1989), *amended,* 902 F.2d 18, *cert. denied,* —— U.S. ——, 111 S.Ct. 64, 112 L.Ed.2d 39 (1990); *Harris v. Pulley,* 885 F.2d 1354, 1361 (9th Cir.1988), *cert. denied,* 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990). "A district judge had broad discretion in ruling on a motion for change in venue." *Rewald,* 889 F.2d at 863; *see also United States v. Bailleaux,* 685 F.2d 1105, 1108 (9th Cir.1982) ("denial of such motion should be reversed only upon a showing of a clear abuse of discretion"). Additionally, a "trial court's findings of juror impartiality may 'be overturned only for "manifest error." ' " *Mu'Min v. Virginia,* —— U.S. at ——, 111 S.Ct. at 1907 (quoting *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2888, 81 L.Ed.2d 847 (1984)).

### A. Presumed Prejudice

Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. Under such circumstances, it is not necessary to demonstrate actual bias. The presumed prejudice principle is rarely applicable, and is reserved for an "extreme situation."

*Harris,* 885 F.2d at 1361 (citations omitted). Prejudice was presumed in cases such as *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), which involved a barrage of inflammatory publicity immediately before trial; *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), in which the defendant's twenty-minute confession was televised three times in community of 150,000 residents; and *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), and *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), where the trials were

**22.** After the jury was sworn, the *Anchorage Daily News* ran a front page story listing the names and a brief profile of each juror. When the court learned that some of the jurors had been contacted after the story ran, it conducted an individual voir dire. One of the jurors testified that she had been contacted by persons who offered their opinions about the defendants. The court excused her. Other jurors were also contacted, but the court found those contacts unrelated to the substance of the case and "beyond doubt" harmless to the defendants.

conducted in a "circus atmosphere" as a result of media intrusions.

Although the pretrial publicity was substantial in this case, it was not of the kind where "a court could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law." *Rewald*, 889 F.2d at 863 (quoting *Beck v. Washington*, 369 U.S. 541, 557, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1962)). As the district court found, most of the newspaper coverage was largely factual and neutral in nature. Rather than discussing the defendants' guilt or innocence, the coverage described the North Slope Borough investigation in general, and when Dischner or Mathisen were mentioned, it was in the context of a summary of charges against them and the conduct that underlay the indictment. In this respect this case is similar to several others holding pretrial publicity did not require a change of venue to ensure an impartial jury. *See Murphy v. Florida*, 421 U.S. 794, 802, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975) (news articles "largely factual in nature"); *Angiulo*, 897 F.2d at 1181 ("Although the news coverage was extensive, it largely was factual in nature"); *Harris*, 885 F.2d at 1362 ("The vast majority of the media accounts are largely factual in nature."); *Bailleaux*, 685 F.2d at 1109 ("media coverage of the crimes themselves was basically factual and neutral"). Furthermore, while this news coverage continued up to and through the trial, much of the publicity occurred over a span of a few years prior to the time of jury selection. This tends to dissipate the prejudicial impact of media coverage. *See Patton*, 467 U.S. at 1025, 104 S.Ct. at 2885; *Bailleaux*, 685 F.2d at 1109.

The research poll Dischner submitted in support of his motion did demonstrate that a large number of people, sixty-nine percent of the registered voters contacted in the Third Judicial District in Alaska (from which jurors for a trial in Anchorage are drawn), were familiar with the investigation of corruption in the North Slope Borough. Of this sixty-nine percent, sixty-four percent believed "serious dishonesty" was involved in the Borough. Ninety percent of those people believed this dishonesty

involved public officials. Thus, thirty-six percent of all those contacted in the poll believed that North Slope public officials were involved in serious dishonesty. The poll did not mention Dischner or Mathisen directly.

That a large percentage of people were familiar with the investigation does not mean that the jury pool is impermissibly tainted. Qualified jurors need not be "totally ignorant of the facts and issues involved." *Murphy*, 421 U.S. at 800, 95 S.Ct. at 2036; *see also Bailleaux*, 685 F.2d at 1109 ("The fact that a juror has heard or read about a crime does not mean that he or she cannot render an impartial verdict."). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Murphy*, 421 U.S. at 800, 95 S.Ct. at 2036 (quoting *Irvin*, 366 U.S. at 723, 81 S.Ct. at 1643). The fact that some prospective jurors had a general belief that serious dishonesty was involved in the North Slope Borough government, a belief not directed specifically at the defendants, is not sufficient to rebut the presumption of a prospective juror's impartiality.

Nor were prospective jurors in this case subject to a " 'barrage of inflammatory publicity immediately prior to trial' amounting to a 'huge wave of public passion[,]' " *Patton*, 467 U.S. at 1032–33, 104 S.Ct. at 2889 that would "warrant a presumption that the jurors selected for the trial ... were prejudiced." *Harris*, 885 F.2d at 1362. While we agree with Mathisen's contention that white collar crime also can engender prejudicial pretrial publicity like violent crimes, the publicity in this case was not of the type that proclaimed the defendants' guilt in advance of the trial and precluded the jurors from independently evaluating the evidence. The trial was not a "hollow formality." *Rideau*, 373 U.S. at 726, 83 S.Ct. at 1419. Indeed, both defendants were acquitted on several counts.

### B. *Actual Prejudice*

Dischner cites portions of the voir dire where prospective jurors acknowledged exposure to publicity as evidence of actual prejudice. However, "[a]ctual preju-

dice is not demonstrated by a showing of exposure to pretrial publicity. 'The relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant.' " *Harris,* 885 F.2d at 1363–64 (quoting *Patton,* 467 U.S. at 1035, 104 S.Ct. at 2890). A key factor in making this determination is the percentage of prospective jurors who " 'will admit to a disqualifying prejudice.' " *Id.* at 1364 (quoting *Murphy,* 421 U.S. at 803, 95 S.Ct. at 2037).

In this case, of the 102 prospective jurors actually voir dired, fifty-three were excused for cause. Seventeen prospective jurors were excused because they had knowledge of the case which impaired their ability to be impartial. Sixteen were excused for other doubts about their ability to be impartial and twenty were released for hardship or personal reasons. In *Murphy,* the Court found that it would not be unusual to excuse twenty persons from a pool of seventy-eight jurors, twenty-six percent of the pool, because they had formed an opinion as to the defendant's guilt. 421 U.S. at 803, 95 S.Ct. at 2037. Based on these figures, we concluded in *Harris* that the fact that nineteen of 103 jurors were excused because they had formed an opinion as to Harris's guilt did not demonstrate actual prejudice in the voir dire examination. *Harris,* 885 F.2d at 1364. This case is almost identical: seventeen of 102 jurors were excused because pretrial publicity affected their impartiality.[23] In light of these findings, the district court did not err in concluding that the jury pool was not so infected by pretrial publicity as to demonstrate actual prejudice that required a change of venue.

Dischner and Mathisen's claim of actual prejudice is further undermined by the thorough voir dire. *See Angiulo,* 897 F.2d at 1183 ("exhaustive procedures employed by the trial court below to screen prospective jurors and impanel an impartial jury" weakened claim of prejudice). Nothing about the record indicates that the jurors were unable to reach a verdict based solely on the evidence presented at trial. The district court's conclusion as to juror impartiality was not manifestly erroneous and it properly denied the motion to change venue.

### XII. Remaining Claims

Dischner and Mathisen also argue that the district court erred in not striking the word "payments" from the RICO and mail and wire fraud counts of the indictment; that it erred in not striking from the indictment overt act four's description of a conversation between Dischner and Fowler; and that in connection with the Alaska bribery predicate acts, the court incorrectly defined for the jury the terms "agent" and "professional advisor." We have carefully examined each contention, and after applying the appropriate standard of review, we have concluded that they are clearly without merit.

AFFIRMED.

---

**23.** Even assuming that half of the sixteen jurors excused as a result of other questions as to their impartiality had formed an opinion as to the defendants' guilt because of pretrial publicity, the district court would still be well within its discretion in not finding actual prejudice. This case would then be similar to the situation in *Murphy,* where twenty-six percent of the jury pool was excused, but still far from the ninety percent of jurors excused in *Irvin* because they had formed an opinion as to guilt.