8 F.3d 32
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Darlington Edo IDIADO, Paul Irabor-Iyangbe, Alhaji
Gani-Ganiyu Opolo Majekodunmi, Matthew Enoyoje
Onaghise, Bernard Wilson Oyatedor, Iyabo
Williams, Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Samuel Okeowo OROGUN, Defendant-Appellant.
 Nos. 92-10056, 92-10091, 92-10072, 92-10107, 92-10106,
92-10075, 92-10126, and 92-10074.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 31, 1993.*
Decided Sept. 28, 1993.
As Amended Dec. 7, 1993.
 
 Before CHOY, D.W. NELSON and NORRIS, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Co-defendants Idiado, Irabor-Iyangbe, Majekodunmi, Onaghise, Orogun, Oyatedor, and Williams appeal their jury convictions and sentences under the Sentencing Guidelines for various offenses arising from a narcotics trafficking operation, including conspiring to import and importing, and conspiring to distribute, heroin in violation of 21 U.S.C. §§ 963, 846, and 952(a). We AFFIRM the convictions and the sentences, with the exception of Williams' sentence, which we VACATE and REMAND for resentencing in light of this disposition.
 
 
 3
 * A. Reasonable Suspicion--Idiado
 
 
 4
 Idiado challenges the district court's denial of his motion to suppress the fruit of his April 1990 stop by customs officials at San Francisco International Airport. We review de novo the district court's finding that reasonable suspicion existed, while reviewing for clear error the factual determinations supporting that finding. U.S. v. Espinosa, 827 F.2d 604, 608 (9th Cir.), cert. denied, 485 U.S. 968 (1988).
 
 
 5
 Routine border stops may be conducted without any basis whatsoever, and reasonable suspicion is required only when customs officers go beyond routine investigatory techniques. U.S. v. Montoya de Hernandez, 473 U.S. 531, 538 (1985). The district court did not err in determining that a non-routine investigation began when the customs officials first sought to conduct an x-ray examination by obtaining either Idiado's consent or a search warrant.[1] At this point, customs officials had ample information to support reasonable suspicion.[2]
 
 B. Reasonable Suspicion--Orogun
 
 6
 Orogun was stopped in September 1990 by customs officials at Logan International Airport. He appeals the district court's finding of reasonable suspicion by incorporating, with no further elaboration, Idiado's arguments. The court's factual findings regarding the information known to customs officials were not clearly erroneous[3] and are sufficient to support reasonable suspicion.
 
 
 7
 In addition, Orogun moved to suppress evidence based on claims that he did not sign an x-ray consent form voluntarily; that he requested and was denied assistance of counsel during questioning in a secondary examination room; and that he was never read his Miranda rights. The district court, however, found that the evidence contradicted each of Orogun's claims. In short, it found the testimony of three customs officials to be more credible and determined that the government had established by a preponderance of the evidence the following: customs personnel advised Orogun of his Miranda rights; Orogun did not ask for, and was not denied, an attorney; and Orogun's consent to the x-ray and statements to customs officials were "free and voluntary" under the totality of the circumstances.
 
 
 8
 We review for clear error the district court's factual findings regarding voluntariness of consent and confessions, while reviewing de novo the legal conclusion of voluntariness. U.S. v. Miller, No. 91-50130 (9th Cir. Jan. 28, 1993) (confession); U.S. v. Koshnevis, 979 F.2d 691, 694 (9th Cir.1992) (consent). Orogun presents little evidence to contradict the district court's factual findings or legal conclusions. His brief consists simply of short, conclusory arguments based on his own testimony, which was contradicted by the testimony of the three customs officials and by other evidence, and which the district court did not find credible. We AFFIRM.
 
 C. Stop Based on Race or National Origin
 
 9
 Idiado and Orogun assert that their stops by customs officials were improperly based on their race or national origin. They raise this issue for the first time on appeal. As a general rule, we will not consider issues raised for the first time on appeal. U.S. v. Carlson, 900 F.2d 1346, 1349 (9th Cir.). This issue does not qualify for any of the exceptions in Carlson. Id. The defendants' failure to raise the issue below denied the government the opportunity to develop a factual record on the subject. Thus, the issue has been waived.
 
 II
 
 10
 Appellant Oyatedor argues that the district court abused its discretion in declining to suppress certain subpoenaed documents. After a hearing on this issue, the district court agreed with Oyatedor that the government's subpoena was unauthorized and that the government should have obtained a subpoena from a general duty judge.[4] The court nevertheless ruled that Oyatedor lacked standing to suppress the documents, and that in any case suppression would not be proper because the government had already legally obtained and reviewed the documents.
 
 
 11
 This raises two issues: (1) did Oyatedor have standing to suppress the documents; and (2) did the district court err in determining that suppression was not appropriate here and in instead designing a remedy to address the government's acknowledged mistake. It is unnecessary to reach the standing issue because we rule that the district court did not err in denying Oyatedor's motion to suppress.
 
 
 12
 Generally, motions to suppress are reviewed de novo. U.S. v. Homick, 964 F.2d 899, 902 (9th Cir.1992). The trial court's factual findings are reviewed for clear error. U.S. v. Negrete-Gonzales, 966 F.2d 1277 (9th Cir.1992). And, "[e]nforcing or quashing Rule 17(c) subpoenas is within the discretion of the trial judge and will not be disturbed unless clearly arbitrary...." U.S. v. Reed, 726 F.2d 570, 577 (9th Cir.), cert. denied, 469 U.S. 871 (1984).
 
 
 13
 The district court correctly determined that suppression was not the appropriate remedy in this case. Unlike the typical suppression case, here the government did not obtain its initial possession and knowledge of the documents through an illegal search warrant or subpoena. After legally obtaining the documents, the government reviewed them before voluntarily returning them to defense counsel. Even defense counsel conceded that the government could testify about its knowledge of the contents of the documents. And the government could always resubpoena the actual documents. Thus, the district court concluded properly that the goals of the Exclusionary Rule would not be furthered by suppression.
 
 
 14
 Rather than quash the subpoena and order the documents returned immediately to Oyatedor, the district court ordered the government to expedite its review, make copies of those it deemed inculpatory, and return them to Oyatedor with a list of those it had duplicated. Moreover, it provided Oyatedor with additional time to file any motions that may have been delayed by the government's actions. This remedy was reasonable and appropriate.
 
 III
 
 15
 Appellants Onaghise and Oyatedor assert that the district court erred in refusing to sever their cases. We review for abuse of discretion the trial judge's decision not to sever a case. U.S. v. Wyatt, 807 F.2d 1480, 1482 (9th Cir.), cert. denied, 484 U.S. 858 (1987). A district court has tremendous discretion to deny such motions because a heavy preference is placed on joint trials of defendants indicted together. Zafiro v. U.S., 113 S.Ct. 933, 938 (1993). Thus, a district court should sever only if a joint trial is "so manifestly prejudicial that it outweigh[s] the dominant concern with judicial economy." U.S. v. Conners, 825 F.2d 1384, 1391 (9th Cir.1987). We AFFIRM.
 
 A. Onaghise
 
 16
 Onaghise asserts that his case should have been severed because counsel for co-defendant elicited two statements from a U.S. Customs agent describing comments made by Idiado at the airport alleging that Onaghise was carrying heroin. Onaghise claims that Idiado's statements violate Bruton v. U.S., 391 U.S. 123, 126, 135-36 (1968) (defendant's Sixth Amendment right to confront his accuser is violated when a facially incriminating confession of a non-testifying codefendant is introduced at the joint trial, even if the jury is instructed to consider the confession only against the codefendant). This rule is limited to facially incriminating confessions. Richardson v. Marsh, 481 U.S. 200, 208-09 (1987); U.S. v. McCown, 711 F.2d 1441, 1448-49 (9th Cir.1983) (Bruton does not limit admission of statements admissible under the co-conspirator exception to the hearsay rule).
 
 
 17
 The district court denied Onaghise's motion to sever, noting that Bruton is inapplicable because Idiado's comment was not a confession but instead a co-conspirator statement.[5] We agree. The district court promised to, and did, employ limiting instructions during the brief testimony about Idiado's remarks, and noted that if a Bruton problem arose, a severance would be granted.
 
 
 18
 Moreover, Onaghise makes an insufficient showing that the district court's prompt and clear instructions after each of the two questions regarding Idiado's statements were inadequate to allow the jury to compartmentalize the evidence against each defendant. See U.S. v. Candoli, 870 F.2d 496, 510 (9th Cir.1989); U.S. v. Douglass, 780 F.2d 1472, 1479 (9th Cir.1986) ("A crucial factor is the judge's diligence--or lack thereof--in instructing the jury on the purposes to which various strands of evidence may be put."). Finally, given the other eyewitness and demonstrative evidence legitimately admitted against Onaghise, including the 120 heroin-filled balloons he passed, this situation is not one where joinder was so manifestly prejudicial that it outweighed the dominant concern for judicial economy. The district court did not abuse its discretion.
 
 B. Oyatedor
 
 19
 At trial, the district court denied various motions to sever based on claims of disproportionate evidence against individual defendants, ruling that any problems could be handled by jury instructions. Only Oyatedor appeals based on this "spill-over" theory.
 
 
 20
 Oyatedor claims that the evidence against the other six defendants was disproportionately stronger than the evidence against him, and given his "peripheral" involvement in the scheme, that this evidence rubbed-off on him and prejudiced his defense. However, this Court has stated that "[j]oint participation in a criminal activity generally means a joint indictment and a joint trial.... The fact that there may be more incriminating evidence against one defendant than ... against another, is insufficient to justify a separate trial for the latter." U.S. v. Marcello, 731 F.2d 1354, 1360 (9th Cir.1984).
 
 
 21
 Oyatedor does not meet the heavy burden of showing that he was entitled to a separate trial. The evidence against Oyatedor was strong and similar to that introduced against the others. Oyatedor does not point to any specific evidence that was improperly admitted against him, noting only that it was stronger against others and that this tainted his trial. Moreover, most of the evidence against the others could have been admitted in his separate trial to establish the existence of the conspiracy. See U.S. v. Sitton, 968 F.2d 947, 961 (9th Cir.1992), cert. denied, 113 S.Ct. 1306 (1993). Finally, the district court never refused to grant a limiting instruction and did not abuse its discretion in denying Oyatedor's motion to sever.
 
 IV
 
 22
 All seven defendants assert that they must be granted a new trial because the district court erred in refusing a defense request that it read a list of government witnesses to prospective jurors. They claim that this severely compromised their ability to thoroughly voir dire potential jurors regarding possible connections with government witnesses and to uncover bias or prejudice.
 
 
 23
 A judge's conduct of voir dire is reviewed for abuse of discretion. U.S. v. Cutler, 806 F.2d 933, 936-37 (9th Cir.1986). A trial court has wide discretion in conducting voir dire in the area of pretrial publicity and juror bias, Mu'Min v. Virginia, 111 S.Ct. 1899, 1906 (1991), and both sides agree that in a non-capital case, the government has no obligation to disclose the names of its witnesses prior to trial. U.S. v. Dischner, 974 F.2d 1502, 1522 (9th Cir.1992), cert. denied, 113 S.Ct. 1290 (1993).
 
 
 24
 The central question is whether defendants knew of the government's major witnesses and could have asked potential jurors about them. We believe that Dischner controls[6] and that defendants' fail in their attempt to distinguish the case.
 
 
 25
 As in Dischner, the defense attorneys here already knew many of the witnesses the government would call in its case-in-chief, including, obviously, Craddock. Yet, despite the opportunity to supplement the judge's questions with those of their own, defense counsel never asked a single potential juror about a government witness. We are unpersuaded by the defendants' assertion that they did not believe they could ask such questions after the court had deemed it improper to read the witness list to the jury and declined to ask any questions about major witnesses. The district court did not abuse its discretion in refusing to read the government's witness list to prospective jurors. We AFFIRM.
 
 V
 
 26
 All seven defendants contest two of the government's twelve peremptory challenges, asserting that the district court erred in ruling that the government's reasons were racially neutral and non-pretextual. Both potential jurors were African American. The standard of review is extremely deferential--the trial court's findings will not be set aside unless they are clearly erroneous. Hernandez v. New York, 111 S.Ct. 1859, 1869-70 (1991); U.S. v. Bishop, 959 F.2d 820, 826 (9th Cir.1992).
 
 
 27
 The prosecution explained that it rejected the two jurors because of statements made during voir dire indicating that they might be unable to fairly judge the credibility of government witnesses. The district court did not clearly err by finding that the government's explanations for their strikes were race-neutral and non-pretextual, thus satisfying the requirements of Batson v. Kentucky, 476 U.S. 79, 98 (1986).
 
 
 28
 Defendants' claim that this case is analogous to Bishop, 959 F.2d at 825 (prosecutors may not exclude jurors based simply on the assumption that residents of predominantly poor, minority communities are likely to be hostile to police), misses the mark. Unlike Bishop, no general, group-based suppositions were used here. In each instance, the government offered a race-neutral explanation why that specific juror might be biased against law enforcement officials. Batson, 476 U.S. at 98 ("The prosecutor ... must articulate a race-neutral explanation related to the particular case to be tried."). We AFFIRM.
 
 VI
 
 29
 All seven defendants claim that the district court's decision to admit evidence of threats against Craddock was based upon an improper balancing of probity and prejudice under Rule 403. We review for abuse of discretion a court's admission of evidence and its balancing under Rule 403. U.S. v. Catabran, 836 F.2d 453, 456 (9th Cir.1988). To reverse, we must find it more probable than not that the alleged error tainted the verdict.
 
 
 30
 The first major issue is whether the defense opened the door to this testimony. Defendants argue that their questions on cross were intended only to discover whether Craddock was fearful of what would happen to her children if she was convicted, which was relevant to bias. They assert that it was the agent's non-responsive answer that opened the door. But Majekodunmi's counsel admitted that "[o]bviously I did open the door to some extent." SER at 68. And, contrary to the defendants' characterization of the questioning, the clear thrust of the questions before and after this exchange was whether the government had pressured or coerced Craddock into testifying. SER at 48-50.[7] Thus, the district court reasonably determined that this line of questioning opened the door to government inquiry on re-direct into Craddock's motivation for testifying.
 
 
 31
 Next, we address whether the government elicited only enough testimony to cure the misleading impression raised by defense counsel that Craddock was coerced or pressured into testifying. On re-direct, the prosecutor asked only two brief questions about the threats, neither of which mentioned the defendants. In fact, it was defense counsel who delved into the topic on re-cross, inquiring whether there was any evidence linking the defendants to the threats. The record supports the conclusion that the prosecution employed the doctrine of curative admissibility cautiously and judiciously, as a shield and not as a sword.
 
 
 32
 Finally, defendants assert that they should not all suffer from the actions of one defendant's attorney. They argue that even if Majekodunmi's counsel did "open the door" for this testimony to be used against him, the same cannot be said for the other defendants. The district court also briefly acknowledged this concern: "You take the position it's separate as to each one of you, and there is some validity to that." SER at 67. However, we believe the district court's proposed limiting instructions, which defense counsel rejected for tactical reasons, constituted a sufficient remedy for this problem. We AFFIRM.
 
 VII
 
 33
 All seven defendants claim that the district court erred when it permitted, over defense objections, a U.S. Customs official to testify that one of the grounds on which he decided to detain Idiado and Onaghise was their arrival from Nigeria, which is considered a "source country" for heroin. Defendants claim that the district court did not strike a proper Rule 403 balance between the probative value and prejudicial effect of this testimony. Furthermore, they assert that because this evidence tainted "all Nigerians," especially those like defendants who travelled from a "source country," it is akin to "drug courier profile evidence," which this Court has found to be inherently prejudicial when used as substantive evidence of a defendant's innocence or guilt. Onaghise Brief at 42 (citing U.S. v. Beltran-Rios, 878 F.2d 1208, 1210 (9th Cir.1989)).
 
 
 34
 A district court's decision to admit evidence and its evaluation of the Rule 403 balancing test are reviewed for abuse of discretion. U.S. v. Crespo de Llano, 838 F.2d 1006, 1018 (9th Cir.1987). To reverse, we must find it more probable than not that the alleged error affected the verdict. U.S. v. Lee, 846 F.2d 531, 536 (9th Cir.1988).
 
 
 35
 Defendants' attempt to draw the analogy between this evidence and "drug courier profiles" fails. They offer no case in which reference to a "source country" has been found to be improper. The government argues convincingly that the simple fact that a country is known by U.S. Customs to be a source of heroin is unlike, and far less prejudicial than, an opinion that a particular defendant fits a drug courier profile and is therefore likely to have been carrying or distributing drugs. In addition, the government never used this evidence as substantive evidence of guilt. The district court did not abuse its discretion when it admitted this testimony.
 
 
 36
 Moreover, it is extremely unlikely that this testimony affected the verdict. Defense counsel independently elicited testimony that "Nigeria is known as a source country" and "Nigeria is known for drugs." Red at 52. In fact, the entire six week trial, and the bulk of the testimony, concerned Nigerian nationals smuggling heroin into the U.S. from Nigeria. We AFFIRM.
 
 VIII
 
 37
 Onaghise claims that the district court abused its discretion when it denied both Onaghise's motion for a new trial based on ineffective assistance of counsel and his motion for an evidentiary hearing on this issue. We have held over and over that "[c]laims of ineffective assistance raise questions best resolved in a habeas corpus proceeding, not on direct appeal." See, e.g., U.S. v. Sanclemente-Bejarano, 861 F.2d 206, 211 (9th Cir.1988). Addressing the issue on habeas is preferable because "it permits the defendant to develop a record as to what counsel did, why it was done, and what, if any, prejudice resulted." U.S. v. Rewald, 889 F.2d 836, 859 (9th Cir.1989), cert. denied, 498 U.S. 819 (1990) (quotation marks omitted). The one exception is where the defendant's legal representation was so inadequate as to obviously deny him his Sixth Amendment right to counsel. Id.
 
 
 38
 This is not such a situation. In fact, Onaghise's attorney attempted to argue his blame-shifting defense. The question in Onaghise's mind is whether she did so effectively. Thus, we conclude that this claim should be resolved in a § 2255 proceeding where a better record can be established.
 
 IX
 
 39
 Five of the seven defendants appeal various aspects of their sentences.
 
 A. Base Offense Level
 
 40
 With regard to a district court's determination of the base offense level, we review only for clear error the judge's factual findings that conduct in furtherance of the conspiracy was reasonably foreseeable by the defendant. U.S. v. Torres-Rodriguez, 930 F.2d 1375, 1389 (9th Cir.1991). A district court's interpretation and application of the Guidelines is reviewed de novo. United States v. Blaize, 959 F.2d 850, 851 (9th Cir.), cert. denied, 112 S.Ct. 2954 (1992).
 
 
 41
 The defendants assert that the district court misapplied the Guidelines because it failed to make express factual determinations for each defendant in determining the base offense level. Under § 1B1.3, each conspirator "is to be judged not on the distribution made by the entire conspiracy but on the basis of the quantity of drugs which he reasonably foresaw or which fell within 'the scope' of his particular agreement with the conspirators." U.S. v. Petty, 992 F.2d 887, 890 (9th Cir.1993) (emphasis added); see also U.S. v. Conkins, 987 F.2d 564, 572-73 (9th Cir.1993).
 
 
 42
 The record shows, however, that the district court knew of this requirement and sentenced each defendant individually, rather than based on simply a general assumption that each was liable for the entire amount smuggled by the conspiracy.[8]
 
 
 43
 1. Onaghise: Onaghise challenges the district court's finding that it was reasonably foreseeable to Onaghise that at least three kilos of heroin would be imported by the conspiracy. This finding was not clearly erroneous. Onaghise was directly involved in three trips in which he and Idiado smuggled 2809 grams (2.8 kilos) of heroin. During his involvement in the conspiracy, other members imported at least 2587 grams (2.5 kilos).[9] These facts, together with evidence that Onaghise interacted and had contact with all of the conspiracy's principals during this period, support the district court's preponderance finding of foreseeability. We AFFIRM.
 
 
 44
 2. Orogun: Orogun's argument is essentially the same as Onaghise's. Orogun, however, made two more trips than Onaghise and was involved with the conspiracy for a longer period. During Orogun's five trips, he and the other couriers were directly responsible for importing 2252 grams (2.25 kilos). During his involvement in the conspiracy, other members imported another 3496 grams (3.5 kilos). In light of the evidence of Orogun's extensive contact with the other conspirators, including a recorded conversation indicating his knowledge of Onaghise's and Idiado's trips, the finding of reasonable foreseeability of three kilos was not clearly erroneous. We AFFIRM.
 
 
 45
 3. Oyatedor: Oyatedor asserts that he cannot be held liable for any heroin imported after he "left" the conspiracy, at least until he became involved again in August 1990. The district court considered this argument at a hearing on Oyatedor's motion to reconsider. The record indicates that Oyatedor was a founder of the conspiracy, had a leadership role, and went on at least two trips involving 1.5 kilos of heroin. It also indicates that Oyatedor continued to have frequent contact with the conspirators during his "absence" and that he became active again in August when he sold an additional unknown quantity of heroin in Chicago. The conspiracy imported at least an additional 1200 grams (1.2 kilos) in August and September 1990. In light of this evidence, the court did not clearly err when it found that Oyatedor could reasonably have foreseen the importation of three kilos. We AFFIRM.
 
 
 46
 4. Williams: Judge Legge found that Williams "was plainly an intricate part of the organization. She was in the middle of it, reservations, money, passing on drugs and all of that. So I certainly think she should be charged with three to ten kilos." SER at 175. These findings are supported by substantial evidence. Williams took eight trips to Nigeria, carried drugs and money, supervised couriers, and was in frequent contact with other conspirators as well as the group's supplier and distributors. Thus, the district court did not clearly err when it found Williams could reasonably have foreseen the importation of three kilos. We AFFIRM.
 
 B. Role in the Offense
 
 47
 Whether an appellant was an organizer, leader, manager or supervisor pursuant to § 3B1.1 of the Guidelines is reviewable under the clearly erroneous standard. U.S. v. Sanchez, 908 F.2d 1443, 1447 (9th Cir.1990). We have held that it must be proved by a preponderance of the evidence that some degree of control or organizational authority over one of the other defendants existed in order for § 3B1.1 to apply. U.S. v. Mares-Molina, 913 F.2d 770, 773 (9th Cir.1990); see also U.S. v. Hoac, 990 F.2d 1099, 1110-11 (9th Cir.1993).
 
 
 48
 1. Majekodunmi: The district court adopted the findings of the Pre-Sentence Report and enhanced Majekodunmi's sentence by four levels for being "an overall princip[al] and leader and organizer throughout the overwhelming history of this event." SER at 174. The finding that Majekodunmi was a founder and organizer is supported by substantial evidence in the record and is not clearly erroneous.[10] We AFFIRM.
 
 
 49
 2. Oyatedor: The district court enhanced Oyatedor's sentence by three points (rather than the four recommended by the Pre-Sentence Report) based on the finding that Oyatedor was a "manager or supervisor." SER at 195-96. Substantial evidence supports this conclusion.[11] We AFFIRM.
 
 
 50
 3. Williams: The district court found that Williams qualified for a two-level enhancement (rather than the three-level enhancement requested by the Pre-Sentence Report) based on her role as a primary lieutenant of both the distributors in Chicago and the Nigerian supplier. There is ample evidence that Williams was a mid-level or higher participant in the scheme; the record also satisfies the Mares-Molina control requirement.[12] We AFFIRM.
 
 C. Acceptance of Responsibility
 
 51
 The district court agreed with the Probation Office that Williams was not entitled to credit for acceptance of responsibility under § 3E1.1 of the Guidelines. This determination is reviewed only for clear error. U.S. v. Gonzales, 897 F.2d 1018, 1019 (9th Cir.1990). Williams' challenge is based primarily on a letter sent to the district court the day before sentencing expressing contrition and similar expressions made at the sentencing hearing.[13]
 
 
 52
 Williams concedes that a number of circuits, including the Ninth, have discounted a defendant's belated expression of remorse. See, e.g., U.S. v. Restrepo, 930 F.2d 705, 710 (9th Cir.1991) (no clear error where defendant expressed remorse for first time in letter to the court and at sentencing). She argues, however, that this case is different because the district court held as a matter of law that a defendant cannot accept responsibility after she goes to trial. The court made its first finding on this matter at Williams' motion to reconsider: "I just don't think that--grounds for credit can exist after a defendant goes all the way through trial, gets to the stand and testifies, tells her own story. I don't think that an admission at the end of all that, that she's sorry, amounts to an acceptance of responsibility." SER at 195A.
 
 
 53
 We believe that the district court has articulated a rule of law, perhaps inadvertently, which conflicts with the plain language of § 3E1.1: "A defendant may be given consideration under this section without regard to whether his conviction is based upon a guilty plea or a finding of guilt by the court or jury or the practical certainty of conviction at trial." U.S.S.G. § 3E1.1. We have held as a matter of law that the sentencing court "may not balance against evidence of remorse or acceptance of responsibility" the defendant's choice to exercise a constitutional right, such as a decision to go to trial. U.S. v. Watt, 910 F.2d 587, 592 (9th Cir.1990); see also U.S. v. Johnson, 956 F.2d 894, 904 (9th Cir.1992) (addressing, but not resolving, the apparent conflict between § 3E1.1's text and commentary language suggesting that a defendant who goes to trial will be eligible for the reduction only in "rare situations"); cf. U.S. v. Gonzalez, 897 F.2d 1018, 1020 (9th Cir.1990) (upholding denial of acceptance of responsibility based upon defendant's conduct at trial, rather than the choice to exercise his Sixth Amendment right to trial). When sentencing Williams anew, the district court should make a factual determination whether Williams accepted responsibility within the meaning of § 3E1.1.
 
 D. Downward Departure
 
 54
 The district court denied Williams' motion for downward departure based on her history of child abuse. Williams concedes that normally a defendant cannot appeal a refusal to depart downward from the Guidelines. See, e.g., U.S. v. Mun, 928 F.2d 323, 324 (9th Cir.1991). She argues, however, that in rejecting her claim, the district court made a "legal ruling that childhood abuse cannot be the basis for downward departure unless the abuse is temporally located to the main offense." Williams Blue at 45. The court did not do this. Rather, it simply found that Williams' experience as a child fell short of establishing the required direct and proximate nexus between past events and the instant offense. See U.S. v. Floyd, 945 F.2d 1096, 1099 (9th Cir.1991). Thus, we decline to review the district court's decision denying a downward departure.
 
 
 55
 AFFIRMED IN PART, VACATED AND REMANDED.
 
 
 
 *
 Cases Nos. 92-10056 and 92-10072 were submitted on the briefs
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 See U.S. v. Montoya de Hernandez, 473 U.S. 531, 541 n. 4 (1985) (listing strip, body-cavity, or involuntary x-ray searches as non-routine border searches); U.S. v. Sandoval-Vargas, 854 F.2d 1132, 1134 & n. 2 (9th Cir.), cert. denied, 488 U.S. 912 (1988) (search occurring at secondary inspection point was not non-routine); Klein v. U.S., 472 F.2d 847, 849 (9th Cir.1973) (same)
 
 
 [2]
 This information included, among other things, Idiado's and Onaghise's nervousness and excessive perspiration and their unusually stiff and frozen posture at the baggage carousel; their arrival from a source country; previous trips by Idiado to Nigeria which did not appear in his passport; their denial of joint travel or knowledge of each other, which was rebutted by photographs of one another found in their suitcases and by their sequentially numbered tickets from the same Oakland travel agency; their inability to afford frequent travel to Nigeria on their stated incomes, and large deposits in Onaghise's bank book inconsistent with his income; various medications found on Onaghise often used by body smugglers to control nerves during questioning; and the fecal odor emitted by Onaghise (characteristic of balloon swallowers). Taken as a whole, this evidence supports reasonable suspicion even at the earlier point where customs officials transferred Idiado and Onaghise from the open secondary inspection area to separate secondary examination rooms
 
 
 [3]
 The evidence includes Orogun's travel from a source country and use of a circuitous route; his repeated travel from Nigeria during a short period of time; questionable information he had given earlier about his occupation; contradictions between the trips in his passport and those shown in U.S. Customs Service records; his failure to explain the circumstances surrounding his claim that he lost a prior passport; his equivocal and evasive answers to questions about his travel; possession of an anti-diarrhea medication; and excessive nervousness
 
 
 [4]
 The district court characterized the government's mistake as "an inadvertent error, not a legal error." SER at 17-18
 
 
 [5]
 Onaghise himself all but admits that Idiado's remarks to the customs agent did not constitute a confession. Onaghise Blue at 39-40 (using "statement," rather than "confession," to describe Idiado's comments); Onaghise Reply at 14 ("True, Idiado's statement was not much of a confession regarding his own involvement.")
 
 
 [6]
 In Dischner, this Court held that two cases cited by the defendants, U.S. v. Washington, 819 F.2d 221 (9th Cir.1987) and U.S. v. Baldwin, 607 F.2d 1295 (9th Cir.1979), do not require that the trial court question venirepersons about every possible government witness. Dischner, 974 F.2d at 1523
 
 
 [7]
 One representative question was: "Were there any other techniques taught to you such as identifying what would seem important to a person so that you can--you could try to use some persuasion techniques to try to talk a person into cooperating with you?" SER at 50
 
 
 [8]
 Before sentencing, the district court first heard argument from all of the defendants and asked in each case whether they had objections to the Pre-Sentence Report. The court then proceeded to sentencing, stating that the "issue here in a conspiracy such as this is the issue of reasonable foreseeability." SER at 170-71. It later reemphasized this point, stating that it had not relied on a general Pinkerton theory of liability, but had made individual findings regarding foreseeability. Furthermore, it noted that it was adopting the findings of the Pre-Sentence Reports except where specifically noted. In fact, it gave the defendants the benefit of the doubt in going below the government's figures of the amount of heroin involved and, in particular, in going below the amounts that the Probation Office had found Oyatedor and Onaghise knew of or foresaw. Finally, the court restated its grounds for sentencing with respect to individual defendants at a hearing on their motions to reconsider
 
 
 [9]
 These figures, and those below, are drawn from the chart at Red at 61-62 n. 36
 
 
 [10]
 The record provides evidence that Majekodunmi set up the scheme, invested in early loads of heroin, recruited couriers, supplied them with tickets and visas, and coordinated their travel. This evidence satisfies the control requirements of Mares-Molina, 913 F.2d at 773
 
 
 [11]
 The evidence includes Oyatedor's role as a founder of the conspiracy, his initial connections with heroin suppliers in Nigeria and buyers in Chicago, his role in recruiting couriers and organizing the activity, and his claim to be entitled to a larger share of the initial proceeds (which led to his dispute with Majekodunmi and temporary absence from the conspiracy). This evidence satisfies the Mares-Molina control requirement
 
 
 [12]
 Williams took eight trips, more than any other participant; did not swallow the heroin balloons (the most dangerous and uncomfortable task in the conspiracy), but rather packaged the balloons for the couriers to carry; invested in loads carried by others; distributed courier fees; and told Craddock and Majekodunmi how to book tickets and obtain false passports
 
 
 [13]
 Williams' claim that a fellow defendant told her something that made her reluctant to trust her attorney and accept responsibility is unpersuasive